## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **MR. and MRS. I., as parents and** | ) | |
| **next friends of L.I., a minor,** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 04-165-P-H** |
| | ) | |
| **MAINE SCHOOL ADMINISTRATIVE** | ) | |
| **DISTRICT NO. 55,** | ) | |
| **Defendant** | ) | |


## RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Mr. and Mrs. I. ("Parents"), whose daughter, LI., has been diagnosed with Asperger's Disorder ("Asperger's") and adjustment disorder with a depressed mood, challenge a decision of a Maine Department of Education ("MDOE") hearing officer ("Hearing Officer") siding with defendant Maine School Administrative District No. 55 ("MSAD No. 55" or "District") in ruling L.I. ineligible for special-education services pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400 *et seq.*, and Maine's laws regarding education of exceptional students, 20-A M.R.S.A. § 7001 *et seq. See* Plaintiffs' Memorandum of Law ("Parents' Brief") (Docket No. 20) at 1-2; Complaint (Injunctive Relief Requested) ("Complaint") (Docket No. 1) ¶¶ 1-6.  After careful review of the entire record filed in this case, the memoranda of the parties and the memoranda of three groups permitted to file *amicus curiae* briefs in support of the Parents' position, *see Amici Curiae* Brief of the Disability Rights Center and the Autism Society of Maine ("DRC Brief") (Docket No. 27); *Amicus* Brief [of the Asperger's Association of New England] ("Asperger's Brief") (Docket No. 29),

I propose that the court adopt the following findings of fact and conclusions of law, on the basis of which I recommend that judgment be entered in favor of MSAD No. 55.[1]

## I. Proposed Findings of Fact

1.      L.I. was born January 16, 1992.  Special Education Due Process Hearing Decision ("Hearing Decision"), *[I] v. M.S.A.D. # 55*, Case No. 04.059 (Me. Dep't of Educ. June 25, 2004), at 2, ¶ 1[2]; Record at 73.  She began to attend school within the Sacopee Valley School District, MSAD No. 55, in 1997.  Record at 99; Transcript of Special Education Due Process Hearing ("Transcript"), *[I] v. M.S.A.D. # 55*, Case No. 04.059 (Me. Dep't of Educ.), at 115 (Mrs. I. testimony).[3]  She attended kindergarten and first grade in a multi-age (K-2) classroom at the Hiram Elementary School ("Hiram").  Transcript at 115-17.  For second grade, L.I.'s parents transferred her to her home school, Cornish Elementary School ("Cornish").  *Id*. at 117.  She remained at Cornish until September 29, 2003, during the fall of her sixth-grade school year.  *Id*. at 416, 418 (testimony of Cornish sixth-grade teacher Cyrene Slegona); Record at 362.

2.      By all accounts, L.I.'s public schooling from kindergarten through third grade was uneventful.  She did well in school and excelled academically and in all other ways.  Transcript at 115-18 (Mrs. I. testimony), 270, 275-76 (testimony of MSAD No. 55 Special Education Director James McDevitt); Record at 96-99.

---

[1] On September 22, 2004 the Parents moved to supplement the administrative record with additional evidence.  *See* Plaintiffs' Motion To Permit Presentation of Additional Evidence, etc. (Docket No. 12).  That motion was granted, *see* Memorandum Decision on Motion To Supplement Record (Docket No. 15), following which the Parents filed copies of depositions of Mrs. I. and of Debra Hannon, LCSW, *see* Deposition of [Mrs. I.] ("Mrs. I. Dep.") (Docket No. 16); Deposition of Debra Hannon ("Hannon Dep.") (Docket No. 17).

[2] For ease of reference I shall refer to the Hearing Officer's decision, contained at pages 551-58 of the Administrative Record ("Record"), as "Hearing Decision," citing the consecutively numbered pages of the Hearing Decision itself rather than Record pages.  I have drawn my proposed facts from the Hearing Officer's findings to the extent relevant and supported by the Record, supplementing them with additional evidence from the Record and from the depositions of Hannon and Mrs. I.

[3] For ease of reference I shall refer to the transcript of the due-process hearing, contained at pages 565-701 of the Record, as "Transcript," citing the consecutively numbered pages of the Transcript itself rather than Record pages.

3.       In fourth grade L.I.'s grades were strong and she maintained a group of close friends. Transcript at 125 (Mrs. I. testimony), 381-82, 384-85 (testimony of Cornish fifth-grade teacher Diane Wentworth); Record at 94.  However, during her fourth-grade year L.I. began exhibiting signs of some emotional issues, including anxiety and sadness, as well as difficulties with peer relationships. Hearing Decision at 3, ¶ 4; Record at 75, 101-03; Transcript at 124-29 (Mrs. I. testimony).

4.       L.I. began her fourth-grade year grieving the loss of two family pets in August and then became emotionally affected by the events of September 11, 2001.  Transcript at 118-20 (Mrs. I. testimony).  Cornish teacher Diane Wentworth, who taught L.I. in fifth grade, later reported to her parents that it had been "plain to see last year that [L.I.] was very sad.  I even spoke with [her fourth-grade teacher] about my concern for her then."  Record at 102.  L.I. became indignant about the need to repeat academic work she already had accomplished and began to write dark and irreverent stories at school.  Transcript at 121-23 (Mrs. I. testimony).  The arrival of a new student who spread a rumor that L.I. was "weird" eventually led L.I. to isolate herself from all of the girls in her grade.  *Id*. at 125-26; Record at 363.  L.I. began to be teased at school.  Record at 74.[4]  She also was offended by peer teasing.  Transcript at 156 (Mrs. I. testimony).

5.       During the summer of 2002 L.I. began to ask her mother to home-school her, stating that she did not want to return to Cornish.  Hearing Decision at 3, ¶ 5; Transcript at 132 (Mrs. I. testimony).  Mrs. I. refused this request, and L.I. returned to Cornish.  *Id*.  At the beginning of fifth grade (the 2002-03 school year) Wentworth noticed that L.I. "seemed to be exhibiting signs of depression" and "sat at a distance from her peers whenever possible."  Hearing Decision at 3, ¶ 5; Record at 103.  According to Wentworth, the health teacher and school counselor also commented

---

[4] The parties dispute whether the teasing was "extensive," as the Parents assert.  *Compare* Parents' Brief at 4, ¶ 5 *with* [District Brief] (Docket No. 30) at 27, 30 & n.18.  The Hearing Officer made no finding with respect to this issue, *see* Hearing Decision at 2-7, and I, too, perceive no need to do so.

about L.I.'s emotional as well as physical distance from the others. Record at 103. L.I. had a very narrow group of male friends at this time, although she did have one girlfriend who shared her particular interest in Japanese anime, a form of animation art that currently is very popular and has spawned a number of magazines, fan clubs and web sites. Hearing Decision at 3, ¶ 5 & n.1; Record at 103; Transcript at 158-59 (Mrs. I. testimony), 393-94, 405 (Wentworth testimony). Wentworth contacted the school counselor and the Parents regarding her concern for L.I. Record at 340.[5] In October or November of that school year, L.I. had a brief falling out with one of her close friends, but worked that issue out. Transcript at 393-94 (Wentworth testimony).

6.     Wentworth also noted that certain school rules were a problem for L.I., although L.I. never disobeyed the rules. Hearing Decision at 3, ¶ 5; Record at 103; Transcript at 394-96 (Wentworth testimony). At Cornish, L.I. reacted to perceived injustice in the public school's rules about silence at lunch, a ban on the use of marbles at recess and a flat prohibition of the Japanese card game Yu-Gi-Oh. Transcript at 126-27, 133-35, 137-40 (Mrs. I. testimony). Wentworth documented that certain school rules, such as the ban against Yi-Gi-Oh trading cards, "were a major issue for [L.I.]." Record at 103. Mrs. I. described her as a child who appeared to "want[] the world her way" – taking a seemingly unreasonable and stubborn stance with respect to rules and requests not to her liking. Transcript at 128-29 (Mrs. I. testimony).

7.     Throughout fifth grade L.I. continued to request that she be home-schooled. *Id*. at 147. The family responded by following the advice of school personnel, seeking out medication and arranging for family counseling to deal with L.I.'s apparent depression. *Id*. at 144-46. The medication, Prozac, did little to help L.I., and she was unable to form a therapeutic relationship with

---

[5] Wentworth e-mailed the Parents that L.I. "so often is not relating to any of her classmates on a personal level or they to her." Record at 101. She also spoke to them about her concern that L.I. was withdrawn "to the point of actually moving her chair back a little bit and not being fully engaged with the class" during discussions. Transcript at 391 (Wentworth testimony).

the chosen family counselor, who took a behavioral approach to her difficulties. Hearing Decision at 3, ¶ 6; Record at 74-75; Transcript at 144-49 (Mrs. I. testimony). Mrs. I. also arranged for L.I. to meet with Amanda Benoit, the school counselor. Transcript at 456, 464-65 (testimony of MSAD No. 55 elementary-school counselor Amanda Benoit). Benoit testified that L.I. met with her only once after Mrs. I. requested the meeting, with L.I. telling her she did not need to meet with her, that she was fine and that she was feeling much better. *Id*. However, L.I. did carry on a sporadic letter-writing exchange with Benoit. Hearing Decision at 3, ¶ 5; Record at 104.

8.     In fifth grade L.I.'s grades dropped from "high honors" to "honors," Record at 51, which Mrs. I. felt was reflective of a loss of motivation to maintain good academic grades, *id*. at 339. Still, L.I. remained a strong student; as Wentworth summarized:

> [S]he's a very intelligent girl. I found her to be a very strong student. She consistently made the honor rol[l] throughout 5th grade. Any time – our curriculum is a standard-based curriculum. It's closely aligned with Maine Learning Results and with national standards. And consequently, we give assessments throughout the year and on every Level 2 assessment, which means, all 5th graders within our district take that assessment, [L.I.] either met or exceeded the standards.

Transcript at 388 (Wentworth testimony); *see also* Record at 93.[6]

9.     L.I. seemed to Wentworth to become more outgoing as the school year went along. Transcript at 391-92 (Wentworth testimony). Whereas earlier in the year she had confined herself to her small group of friends, from December onward she mixed more with other students, talking with others about the environment or politics. *Id*. Wentworth testified that L.I. was respectful, recognized normal rules of interaction and demonstrated strong school citizenship. *Id*. at 398-99. In Wentworth's

---

[6] To the extent that L.I.'s report cards are legible, they reflect that she received nearly all "+"s in kindergarten, first and second grade (indicating that she regularly worked to the best of her ability), nearly all As in third and fourth grade and As and Bs in fifth grade. Record at 93-99. On Maine Educational Assessment ("MEA") tests administered in fourth grade, she met state standards in reading, writing, math and social studies and partially met state standards in science. *Id*. at 95.

view, L.I. had no weird behaviors; "if you stepped into the 5th grade classroom, [she] would totally blend in with the other students." *Id.* at 397-98.

10.     Benoit testified that she went into L.I.'s classroom to teach six lessons in the fall of 2002. *Id.* at 459-60 (Benoit testimony). She described L.I. as eager to participate in class, insightful and mature. *Id.* at 465. According to Benoit, L.I. was not afraid to disagree with other students about issues that were being discussed but was never rude. *Id.* at 466. L.I. did not appear to Benoit to be depressed, although Benoit had heard from Mrs. I. that she was. *Id.* at 466-67.

11.     By the summer of 2003 L.I. was engaged in a trial of new medication and was still begging her mother not to send her back to public school in the fall. *Id.* at 159-60 (Mrs. I. testimony). Mrs. I., confident that L.I.'s sixth-grade teacher, Cyrene Slegona, would be very beneficial, continued to refuse her requests to be home-schooled. *Id.*

12.     Prior to L.I.'s entry into sixth grade, her family enrolled her older sister at The Community School ("TCS"), a private school in South Tamworth, New Hampshire with a democratic structure of school organization that gives students a broader role in school government. Transcript at 161 (Mrs. I. testimony), 228, 233-35 (testimony of TCS Director Martha Carlson).[7] The program offers frequent field trips, including trips abroad, and provides students with work at their own intellectual level. Record at 416, 418.[8] Once L.I.'s older sister began attending the school in September she started telling L.I. how excellent the program was and how, were L.I. there, she could read her anime stories and play with Yu-Gi-Oh cards whenever she wanted. Transcript at 177 (Mrs. I. testimony). As Mrs. I. testified, "the contrast of the two schools started making [L.I.] feel like, why

---

[7] The Transcript describes Carlson as director of the "Sandwich Community School." Transcript at 228. This clearly is a typographical error. *See, e.g.*, Record at 411.

[8] According to its literature, TCS gives students "a voice in how their school is run[,]" allowing them to "consider diversity, human values, and conflict resolution." Record at 418. TCS aims to foster an atmosphere in which "people respect one another, students to students, teacher to student, student to teacher" and in which "[b]ullying, cliques and social divisions are not welcomed." *Id.*

can't I be there?" *Id*. at 177.  As L.I.'s sixth-grade school year approached, she told her mother that she did not want to return to Cornish and expressed interest in being home-schooled or attending TCS. *Id*. at 262.

13.     At the beginning of L.I.'s sixth-grade year she attempted to improve her social relationships with other students.  Hearing Decision at 3, ¶ 7; Record at 74; Transcript at 162-63 (Mrs. I. testimony).  She began dressing in a more feminine manner and began slacking off on her academic assignments, believing that the other students would like her if she were not so academically successful.  *Id*.  She missed four days of school during the first three weeks of the school year. Hearing Decision at 3, ¶ 7; Transcript at 166-67 (Mrs. I. testimony).

14.     On September 18, 2003 L.I. and her mother met with Slegona.  Hearing Decision at 3, ¶ 8; Transcript at 163-64, 168 (Mrs. I. testimony).  Together, Mrs. I. and Slegona crafted a contract for L.I. specifying that if L.I. completed her assignments in October in a satisfactory manner, she would be permitted to study more advanced topics in her area of interest during November.  Hearing Decision at 3, ¶ 8; Transcript at 167-68 (Mrs. I. testimony).

15.     During that meeting Mrs. I. noticed red cuts or scratches on L.I.'s arms.  Hearing Decision at 3, ¶ 9; Transcript at 165-66 (Mrs. I. testimony).  When she questioned Slegona about them, the teacher informed her that L.I. had been taking lengthy bathroom breaks and may have begun to carve into her arms during those periods.  Hearing Decision at 3, ¶ 9; Transcript at 164-66 (Mrs. I. testimony).

16.     Slegona also noticed that during this time frame, L.I. exhibited difficulties with peer relationships, perhaps due to a "serious lack of awareness of the social [and] emotional 'state' of her peers [and] perhaps adults."  Hearing Decision at 3-4, ¶ 10; Record at 200.  Slegona noted, in a report later prepared for purposes of evaluation, that L.I. had exhibited a "[l]imited ability to relate to peers,

other than those she sees as 'misfits' and not a threat to herself[,]" such as less sophisticated classmates and "underdog" boys, and that she had concerns for L.I. regarding "hostility to peers, 'world,' refusal to complete work, passive resistance to meeting learning goals, including those she helped to create."  Record at 196.  She testified at hearing that she never felt able to "reach" L.I., who remained reserved, distant and guarded throughout the first month of her sixth-grade year.  Transcript at 421-23 (Slegona testimony).

17.     L.I.'s fifth- and sixth-grade teachers, Wentworth and Slegona, later reported in a co-authored letter that L.I. had seemed unable "to understand or interpret social situations with her peers.  Unless she is guided through encounters she finds difficult, she can interpret events and/or comments in ways that tend to make her withdraw[]."  Record at 455.[9]  They noted, however:

> [L.I.] is a very bright young girl with strong language and math skills.  She is capable of powerful insights in her reading and writing, often demonstrating mature and sophisticated thought well beyond her years.  Her math skills are also well developed, but language is her favored element.

*Id*.

18.     As the date to sign the contract neared, L.I. became resistant to signing it and remained home from school on September 30 and October 1, 2003.  Hearing Decision 4, ¶ 11; Transcript at 169-70 (Mrs. I. testimony).  During the afternoon of October 1, L.I. and her mother had an argument.  Transcript at 170-71.  L.I. was supposed to write about a piece of literature that she had recently read, and she wanted to write about the fan fiction that she had been reading on the Internet.  *Id*.  Mrs. I. told her she could not write on that topic because it was not literature.  *Id*. at 171-72.  L.I. ran into her room and slammed the door.  *Id*. at 172.  Mrs. I. left to pick up her older daughter at TCS.  *Id*.  When she returned, she found L.I. quietly working.  *Id*. at 174.  It soon became apparent that L.I. had

---

[9] As the District points out, *see* District Brief at 35 n.19, Wentworth testified at hearing that this particular paragraph did not reflect her own views or observations regarding L.I. but rather reflected Slegona's concerns, *see* Transcript at 405-06 (Wentworth testimony).

deliberately ingested numerous tablets of Celexa, a medication that she had been prescribed, as well as numerous Tylenol tablets and a half-bottle of cough syrup.  Hearing Decision at 4, ¶ 11; Record at 120; Transcript at 174-75.

19.    L.I. was taken to the emergency room at Maine Medical Center ("MMC"), where she remained until that evening.  Hearing Decision at 4, ¶ 12; Record at 120, 125.  The hospital social worker, Brenda R. Comolli, noted that L.I. was to remain out of school for the next two days and that the family was to maintain high safety precautions.  Record at 125.  Comolli told the Parents to have a discussion with L.I. in which they would share something that would change in her life and produce a positive impact on her emotional functioning.  Hearing Decision at 4, ¶ 12; Transcript at 177-79 (Mrs. I. testimony).  Because L.I. had been telling hospital personnel she hated school, her parents informed her that upon her release from the hospital she would not have to return to Cornish. Hearing Decision at 4, ¶ 12; Transcript at 179; Record at 120, 202.  They also talked to her about getting into TCS, the private school her sister was attending.  Transcript at 179-80.  Mrs. I. described this as an "implicit promise" that L.I. could attend TCS.  *Id*. at 180.

20.    L.I. quickly made clear how bad she felt about her suicide attempt, stating that she thought she had really hurt her family and would never put them through that again.  Transcript at 31, 42 (testimony of licensed clinical social worker Rose Northrop).  She was feeling "that she really wanted to make more friends and have more peers. . . .  She was feeling pretty depressed about it." *Id.* at 47.

21.    On October 3, 2003 L.I. met with a new counselor, Rose Northrop.  Hearing Decision at 4, ¶ 13; Record at 350, 386-87.[10]  Following their first meeting, Northrop suggested that L.I. might

---

[10] The Hearing Officer mistakenly stated that L.I. first met with Northrop at the emergency room.  *See* Hearing Decision at 4, ¶ 13.  Nothing of consequence turns on that mistake.

have Asperger's, and she arranged for neuropsychological testing to be done by Dr. Ellen Popenoe. Hearing Decision at 4, ¶ 13; Record at 202, 386-87.

22.     On October 10, 2003 the Parents sent an e-mail to Jim McDevitt, director of special services for MSAD No. 55.  Hearing Decision at 4, ¶ 14; Record at 362.  In that e-mail they informed him of L.I.'s suicide attempt and possible diagnosis of Asperger's and the pending neuropsychological evaluation.  *Id*.  They also stated that L.I. would not be coming back to MSAD No. 55 "for the time being" and that they were looking at alternatives.  *Id*.[11]  McDevitt subsequently telephoned the family and shared information about possible alternative placements, such as the Aucocisco School.  Hearing Decision at 4, ¶ 14; Transcript at 184-85 (Mrs. I. testimony).  He explained the process that they would need to follow if they decided to seek a private placement at public cost.  *Id*.  He then e-mailed the family on October 16 and informed them that a pupil evaluation team ("PET") meeting had been scheduled for October 30, 2003.  Hearing Decision at 4, ¶ 14; Record at 361.[12]

23.     Shortly after L.I.'s suicide attempt Mrs. I. contacted TCS to discuss whether the school would accept L.I.  Transcript at 179-82 (Mrs. I. testimony).  TCS said no at that time because L.I. was still on a 24-hour suicide watch at home, and the school felt that she needed more time to process the mental-health crisis she had just experienced.  *Id*. at 239-42 (Carlson testimony).

24.     The PET met on October 30, 2003 and included, in addition to the Parents, Slegona, McDevitt and Benoit, special-education teacher Tracy Neilson, Cornish principal Becky Carpenter, social worker Janet Findlen and Amanda Moulton, a central intake worker from Sweetser.  Hearing Decision at 4, ¶ 15; Record at 86.  After hearing a report from Slegona detailing L.I.'s failure to

---

[11] Specifically, Mrs. I. wrote: "There's no way my daughter is coming back to MSAD #55 for the time being, because she has suffered too much emotional pain with her classmates. So we're looking at alternatives. The school where her older sister goes [TCS] might be appropriate, but we don't know yet." Record at 362.

[12] McDevitt testified at hearing that he was unaware during this time frame that Mrs. I. had promised L.I. she would not have to return to public school. Transcript at 307, 352-53 (McDevitt testimony).

complete academic assignments and self-injurious behavior at the beginning of sixth grade, the PET determined that L.I. would be tutored outside of school for up to ten hours per week until the team could review Dr. Popenoe's findings and recommendations.  Hearing Decision at 4-5, ¶ 15; Record at 88-89.[13]

25.      Dr. Popenoe completed her neuropsychological examination on October 28 and November 3, 2003.  Hearing Decision at 5, ¶ 16; Record at 73.  In a report dated November 18, 2003 she noted that even though L.I.'s W.I.S.C.-IV full-scale IQ was 124 (the superior range), she "experiences significant limitations in many areas of adaptive skills[.]"  Hearing Decision at 5, ¶ 16; Record at 77, 79.  She also noted that L.I.'s weaknesses primarily were in executive skills, "which likely contribute[s] to her behavioral and emotional difficulties."  Hearing Decision at 5, ¶ 16; Record at 81.  L.I. also demonstrated sensory-processing difficulties, particularly on the right side.  *Id*.  After cataloguing L.I.'s behavioral difficulties, such as poor pragmatic language skills that adversely affect social relationships with peers and a restricted range of special interests, Dr. Popenoe suggested a diagnosis of Asperger's.  *Id*.  She also recognized signs of depression and postulated an additional diagnosis of adjustment disorder with depressed mood.  Hearing Decision at 5, ¶ 16; Record at 82.

26.      Dr. Popenoe's recommendations included use of a social-skills coach to help build social skills and develop social judgment and use of a cognitive behavioral approach to treatment by a therapist familiar with Asperger's, who would teach L.I. skills for coping with depression and changing negative thought patterns.  Hearing Decision at 5, ¶ 17; Record at 83.  She also recommended a speech-language evaluation.  Hearing Decision at 5, ¶ 17; Record at 82.

27.      Dr. Popenoe summarized:

---

[13] According to Mrs. I.'s notes of the October 30, 2003 meeting, Slegona described L.I. as follows: "Clearly reluctant from the beginning.  Resisting compliance to assignments she could handle.  For 2 novels she didn't hand in work, then handed in low quality.  Was not paying attention but could pull it together.  Leaving math 5-20 minutes at a time.  Living in fantasy, hurting herself."  Record at (*continued on next page*)

> [L.I.] has many strengths and the outlook for her is very good, but dependent on the level of intervention she receives over the years.  Perhaps the most important thing to remember is that with [L.I.'s] strengths and weaknesses, she will do very well at many things, but poorly at some others.  Thus, it may seem that she should be more capable of some things than she actually is.  It will be important to continue to support and intervene with [L.I.] in her areas of difficulty and not to push her to do things that are overwhelming for her.  With her many strengths she is capable of finding a niche for herself and, with intervention, for developing some skills in the areas that are difficult for her, such as social relationships.

Record at 83.

28.     The speech-language evaluation was completed by Amber Lambke, M.S., CCC-SLP, of Mark R. Hammond Associates, on January 15 and 29, 2004.  Hearing Decision at 5, ¶ 18; Record at 63-71.  Lambke concluded that L.I. presented with "significant social understanding deficits which impact her overall emotional and social well being."  Hearing Decision at 5, ¶ 18; Record at 69.  She further noted that L.I. interpreted situations as either black or white, lacked understanding of the reasoning behind particular actions and had problems tolerating conversations outside of her particular areas of interest.  *Id*.  She recommended, "In order to improve her social understanding in these areas, [L.I.] will require direct teaching of these skills."  *Id*.

29.     On November 4, 2003 Mrs. I. contacted McDevitt, who stated that he would call tutors and get back to her.  Hearing Decision at 5, ¶ 19; Transcript at 187-88 (Mrs. I. testimony).  When Mrs. I. did not hear from McDevitt by November 10, 2003 she began teaching L.I. at home.  Hearing Decision at 5, ¶ 19; Transcript at 191-92; Record at 223.

30.     At the family's request, a PET meeting planned for late November was postponed.  Hearing Decision at 5, ¶ 20; Transcript at 188-89; Record at 351.  Mrs. I. expressed concern about the participation of a particular staff member in the PET process, and decided to seek an advocate to accompany her to the meeting.  *Id*.

---

359.

31.     On December 4, 2003, after further prompting from Mrs. I., McDevitt informed her he would try to reach a potential tutor for L.I. that day.  Record at 355.  When Mrs. I. contacted the potential tutor in mid-December, the tutor still had not heard from McDevitt.  *Id*. at 351.  The promised tutor never materialized, and no one from the District ever explained to the family why the tutor could not be provided as ordered by the PET.  Transcript at 203 (Mrs. I. testimony).  During this time the Parents explored other possible educational alternatives for L.I. while struggling to provide her with a home-school program.  *Id*. at 190-93.  Although L.I. preferred the home-schooling, it did not go well, and Mrs. I. had difficulty getting L.I. to do her work.  *Id*. at 192.  L.I.'s counselor, Northrop, thought it was important for L.I. to get back to school, whether public or private.  *Id*. at 50-52 (Northrop testimony).

32.     In late December 2003 L.I. expressed an interest in attending TCS.  Hearing Decision at 6, ¶ 21; Record at 246.  The family persuaded TCS Director Martha Carlson to accept L.I. on a trial basis as a home-school student for a single morning-block class during the month of January 2004.  Record at 253; Transcript at 197-98 (Mrs. I. testimony).  In January 2004 she began attending on a trial basis, taking a single morning block class.  Hearing Decision at 6, ¶ 21; Transcript at 197-98.

33.     School counselor Benoit wrote a letter dated December 2003 for purposes of assisting L.I.'s application to TCS.  Transcript at 474 (Benoit testimony).  She wrote, *inter alia*:

> I found the citizenship part of the guidance recommendation to be very difficult to fill out for [L.I.].  She is a unique individual with many strengths but also one who has a disability, which makes it difficult for her to make and maintain social relationships.  I didn't feel comfortable rating her in these areas.  For example, "cooperation with adults," she can be highly cooperative under certain situations but if she feels wronged or mistreated in some way by a particular adult, she can be extremely oppositional.  My feeling is that many of the "citizenship" items differ for [L.I.] based on her perspective of a given situation.  She has a black and white way of thinking when it comes to fairness and can be unreasonable at times as it relates to this.

Record at 104.

34.     Benoit testified at hearing that this portion of the letter derived from conversations with others, particularly Mrs. I., and that she had not personally observed these traits in L.I.  Transcript at 477-81, 489-90.

35.     On January 5, 2004 Mrs. I. sent a letter to McDevitt in which she noted the failure of MSAD No. 55 to provide L.I. with a tutor and stated that L.I. would be "beginning private school this month."  Hearing Decision at 6, ¶ 22; Record at 351.  On January 20, 2004, having had no response to her earlier letter, Mrs. I. wrote to MSAD No. 55 Superintendent Sylvia Pease.  Record at 349.  Although the superintendent did call to promise that McDevitt would respond to Mrs. I.'s letter, Mrs. I. never received a written response to it.  Transcript at 203-04 (Mrs. I. testimony).

36.     By letter dated January 28, 2004 Mrs. I. notified McDevitt that the family was "planning to enroll" L.I. in TCS and that she would begin to attend the school full-time on February 2, although she was not an official student yet and would not be until her pending application was complete.  Record at 62.  She added:

> I have been told by Susan Pettingill at the Department of Education that I am required to give you 10 days notice before placing my daughter in an alternative program, but since I just found that out, I'm giving you as much notice as possible.  You and I have been talking about the possibility of the district helping to pay for an alternative program since our first conversation last October.  I understand that it must be established that this is the most appropriate placement we can find for [L.I.], and that there's a process we need to go through to implement this placement.

*Id*.

37.     When L.I. began attending her class at TCS, she appeared withdrawn and isolated from her peers.  Hearing Decision at 6, ¶ 23; Record at 141.[14]  However, she successfully completed the class and in early February began attending four full days of classes at TCS.  Hearing Decision at 6, ¶

---

[14] Initially L.I. arrived to school every day in what TCS Director Carlson termed her "I'm invisible clothing" (elbow-length gloves, scarf and hat).  Transcript at 244.

23; Transcript at 206-07 (Mrs. I. testimony).[15] She made excellent progress in all of her classes and, over time, developed some positive peer relationships, all the while becoming less withdrawn. Hearing Decision at 6, ¶ 23; Record at 145; Transcript at 77, 83-84 89-92 (testimony of TCS teacher Claes Thelemarck), 98, 102-04, 106-07 (testimony of TCS librarian Donna Polhamus).

38.     TCS teacher Claes Thelemarck described L.I. as very active with a small peer group of six to eight students at TCS.  Transcript at 84.  This peer group shared a "great common interest" in anime – the group's "focal point" – but interacted "on other levels as well."  *Id*.  Thelemarck testified that L.I. picked up on "social banter" and was "very socially engaged[.]"  *Id*. at 91.  TCS librarian Donna Polhamus, who served as L.I.'s writing teacher, described her transformation at TCS as "dramatic."  *Id*. at 109.  She noted that L.I. was well-established with a group of friends, whom she had recently seen singing together.  *Id*.  When L.I. and her friends advocated a position on video games at the school that was ultimately rejected, they handled it well: "They felt like, you know, well, it had been decided . . . not the way they chose, but that was okay."  *Id*. at 111.  Although L.I. had been in sixth grade at Cornish, she began TCS in seventh grade, easily handling academic instruction and assignments geared for seventh- and eighth-graders.  *Id*. at 90-92 (Thelemarck testimony).

39.     TCS is not an approved special-education placement.  Hearing Decision at 6, ¶ 24; Record at 294.  It is a small school with an eight-to-one student-teacher ratio.  Hearing Decision at 6, ¶ 24; Transcript at 231 (Carlson testimony).  It currently enrolls one publicly placed student with Asperger's and has enrolled other students with various disabilities.  Hearing Decision at 6, ¶ 24; Transcript at 235-36.

40.     On February 9, 2004 Mrs. I. requested a PET meeting to discuss L.I.'s eligibility for special-education services.  Hearing Decision at 6, ¶ 25; Record at 60.  In March 2004 McDevitt led a

---

[15] The Hearing Officer mistakenly stated that L.I.'s full-time attendance began in late January.  *See* Hearing Decision at 6, ¶ 23. (*continued on next page*)

group from MSAD No. 55 on a visit to TCS, from which all came away feeling that the school was wonderful and they were "more than impressed."  Record at 294.

41.     A PET meeting was held on March 3, 2004 to consider Dr. Popenoe's and Lambke's findings and recommendations and to make a determination about eligibility.  Hearing Decision at 6, ¶ 25; Record at 336.  L.I.'s parents provided the PET with a list of their concerns, beginning with the point that L.I. "felt unsafe in the public school environment last fall and was unable to continue going to school there."  Record at 55.  They concluded: "We have held off making a unilateral placement [at TCS] in an attempt to give the District an extended opportunity to respond to [L.I.'s] needs.  We are concerned that the District has yet to offer [L.I.] an appropriate educational placement that takes into account her need for a setting that is 'safe' emotionally."  *Id*. at 58.

42.     At the meeting the PET reached consensus on L.I.'s dual diagnoses of Asperger's and adjustment disorder with depressed mood.  Hearing Decision at 6, ¶ 25; Record at 51.  There was also consensus that L.I. needed social-skills and pragmatic-language instruction and access to a program that recognized her cognitive strengths.  Hearing Decision at 6, ¶ 25; Record at 342.  The team considered identifying L.I. under the special-education labels of emotional disturbance, autism and "other health impaired," Record at 53, but determined that she did not qualify for special-education services inasmuch as there was no adverse impact on her academic progress, Hearing Decision at 6, ¶ 25; Record at 53.  The family disagreed, and the team agreed to meet on March 8, 2004 to consider the development of a "section 504" plan.  Hearing Decision at 6, ¶ 25; Record at  52, 343.[16]

43.     The team met as scheduled on March 8, 2004, at which time there was consensus that L.I. met the criteria for section 504 eligibility.  Hearing Decision at 6, ¶ 26; Record at 294, 297.  The team developed a plan that included close supervision, speech/language therapy services to address

---

Nothing turns on this error.

16

social-pragmatic instruction, access to social-work services and access to Gifted and Talented offerings of MSAD No. 55. Hearing Decision at 6, ¶ 26; Record at 43. If necessary, L.I. could be tutored by an education technician for three hours a day at home while she made a gradual transition back to public school. *Id*. The family was also offered a choice of elementary schools within the District. *Id*.

44.    L.I.'s parents rejected the District's proposal as insufficient and unnecessarily restrictive, especially in view of L.I.'s success in attending a full-day program in the mainstream environment at TCS. Record at 333. They also objected to the District's proposal as not appropriately addressing L.I.'s fears regarding a return to public school. *Id*. at 33-34. The family communicated its firm belief that L.I. should remain at TCS while an appropriate transitional program was designed and implemented. *Id*. They notified the District of their intention to enroll L.I. as a full-time student at TCS and seek reimbursement from the District for all costs associated with that enrollment. *Id*. at 42.

45.    On April 23, 2004 the family filed a request for a due-process hearing. Hearing Decision at 7, ¶ 27; Record at 3. The hearing was held on May 26 and 28, 2004. Record at 565. In her decision, dated June 28, 2004, Hearing Officer Lynne Williams listed the following as the issues to be decided:

> ?      Did M.S.A.D. #55 violate Student's rights under the I.D.E.A. by failing to find her eligible for special education services as a student with a disability?

> ?      If M.S.A.D. #55 did commit this violation of the I.D.E.A., is Student entitled to a remedy of compensatory educational services?

> ?      If M.S.A.D. #55 did commit this violation, is Student entitled to reimbursement for tuition and other costs incurred in connection with her placement at the Community School in South Tamworth, New Hampshire?

---

[16] This was a reference to section 504 of the federal Rehabilitation Act. *See, e.g*., Record at 44-45.

Hearing Decision at 2, 8.  This was consistent with the position taken by both sides during pre-hearing briefing.  *See, e.g.*, Record at 29, 289.

46.   With respect to the first issue, the Hearing Officer framed the question presented as: "[W]hat constitutes . . . adverse impact [on a student's educational performance] and whether it is present in this case."  Hearing Decision at 7.  She observed that the IDEA did not specifically define "adverse effect on educational performance" but that Maine regulations specifically defined "educational performance" to encompass more than just academic proficiency.  *See id*.  However, she distinguished this case from other eligibility cases, such as *Baltimore City Pub. Sch.*, 37 IDELR 210 (Md. State Educ. Agency Aug. 19, 2002), in which students' non-academic needs had either negatively impacted their academic performance or had placed them at risk for academic failure.  *See id*.  She stated:

> The student in the case at hand exhibits none of these difficulties.  She completes homework independently, is well behaved in class, is successful at test taking and successfully completes projects.  The question at the heart of this dispute, therefore, is not whether a school department is required to address all of a student's needs, including social and emotional, as well as academic, but whether a school department is required to address social and emotional needs when there are *no* academic needs.
>
> Student is obviously a troubled young woman.  She has a depressive disorder as well as a disability that challenges her in social situations.  She is receiving mental health services and will apparently need to continue those services for quite some time.  She will probably always have some difficulties in social situations, but the social progress she has shown at the Community School bodes well for her continuing positive social development.
>
> However, neither the I.D.E.A. nor the Maine Special Education Regulations require a school district to provide special education services to address what is essentially a mental health issue.  Certainly they must accommodate Student's disabilities and M.S.A.D. #55 has done this.  They have offered a Section 504 Plan that essentially includes services and supports addressing all of Dr. Popenoe's recommendations.  The plan includes close supervision, instruction in social pragmatics, access to the "Gifted and Talented" programming, a choice of district schools, access to the school social worker and, if deemed necessary, a plan to gradually transition Student back to public school.

There is no evidence that the district either could not, or will not, implement this plan. The sole stumbling block appears to be Student's serious resistance to returning to Cornish Elementary School. However, no one suggested that Student has a school phobia that renders her emotionally *incapable* of attending a district school. Neither Dr. Popenoe, nor Ms. Northrop, rendered any opinion on whether, for mental health reasons, Student needs to be placed in a small, private school. Nor did either of them suggest that Student could not be successfully educated in public school.

*Id*. at 8 (emphasis in original). The Hearing Officer accordingly held that the District had not violated L.I.'s rights under the IDEA in failing to identify her as eligible for special services. *Id*.

47.     L.I. continued to attend TCS through the conclusion of the 2003-04 school year. Hearing Decision at 6, ¶ 26; Mrs. I. Dep. at 4-5. During the summer of 2004 she spent nearly all waking hours on the computer. Mrs. I Dep. at 6. She wrote and read Japanese anime fan fiction or engaged in instant-messaging with her two peers from TCS who are also interested in anime. *Id*. at 5-6. Yet, even when instant-messaging her schoolmates, she was often role-playing rather than engaging in personal communication. *Id*. at 6. She would leave her computer only to go to the bathroom. *Id*.

48.     Over the summer, L.I. refused Mrs. I's repeated efforts to get her together with her schoolmates. *Id*. at 10. She also shunned phone conversations with these peers. *Id*. She interacted in person with them on only two occasions, one involving an anime convention and one in which she and her schoolmates watched videos all evening. *Id*. at 10-11. She also resisted offers to get together with former Cornish classmates, although she saw one such friend once. *Id*. at 12. When the family went on a week-long vacation to a beach house, L.I. declined to invite a friend because it would have interfered with her preferred activity of watching an entire anime television series that she had purchased on DVD. *Id*. at 7-8.

49.     Since returning to TCS in the fall of 2004 L.I. continues to cluster with her schoolmates around a laptop during a daily half-hour break to watch anime or play anime-related computer games. *Id*. at 21-22. She talks to her friends both about anime and about classes at school. *Id*. at 20.

However, she continues to shun interaction with peers outside of the school setting. *Id*. at 27. Mrs. I. co-taught one of L.I.'s classes for a month, during which time Mrs. I. did not observe L.I. engaging with the class or actively participating. *Id*. at 23. However, Mrs. I. was not present for all of the classes and has been informed through teacher evaluations that L.I. does participate in her classes. *Id*. at 22-23. L.I. continues to do well academically. *Id*. at 28-29.

50.     L.I. began seeing a new counselor, social worker Debra Hannon, in August 2004 after Northrop moved on to a different job. Hannon Dep. at 3, 9; Transcript at 61 (Northrop testimony). Hannon testified that due to Asperger's, L.I. is averse to change. Hannon Dep. at 32. Consistent with this desire for sameness, she limits the foods she eats to pizza, carrots, red pepper, macaroni and cheese, and milk and will try nothing new. Mrs. I. Dep. at 18. L.I. also typically refuses to go outdoors except to get into or out of a vehicle. *Id*. at 19-20.

51.     Hannon feels that L.I. would benefit from social-skills coaching, which would help her process events and learn to use the new information in other settings. Hannon Dep. at 14. In Hannon's opinion, without such contemporaneous coaching, L.I. will have difficulty mastering skills she will need for future employment, such as flexible thinking, problem-solving, teamwork and communication. *Id*. at 20. Hannon finds L.I.'s relationships with her peers to be atypical of those of a child her age in that they (i) are based upon her special interest rather than the qualities of her peers, and (ii) lack shared emotional experiences. *Id*. at 17-19.

## II. Proposed Conclusions of Law

1.     A party dissatisfied with the decision of an MDOE hearing officer may appeal that decision to the Maine Superior Court or the United States District Court. 20-A M.R.S.A. § 7207-B(2)(B); *see also* 20 U.S.C. § 1415(i)(2)(A).[17]

---

[17] The IDEA has been amended effective July 5, 2005. *See, e.g*., 20 U.S.C. § 1401 (Supp. 2005). I have cited to the version of the
(*continued on next page*)

2.      The IDEA provides that a court reviewing the decision of a hearing officer "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(B).

3.      "The role of the district court is to render bounded, independent decisions – bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court."  *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 52 (1st Cir. 1992) (citation and internal quotation marks omitted).  "While the court must recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such findings is ultimately left to the discretion of the trial court."  *Id*. (citations and internal quotation marks omitted).

4.      The First Circuit and other courts have suggested that with respect to a hearing officer's legal conclusions, the level of deference due depends on whether the court is equally well-suited to make the determination despite its lack of educational expertise.  *See, e.g., Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) ("Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation.  More weight, however, is due to an agency's determinations on matters for which educational expertise is relevant.") (citations and internal quotation marks omitted); *Abrahamson v. Hershman*, 701 F.2d 223, 231 (1st Cir. 1983) (noting that while it might be "inappropriate for a district court under the rubric of statutory construction to impose a particular educational methodology upon a state[,]" court was free to construe term "educational" in IDEA "so as to insure, at least, that the state IEP [individualized education plan] provides the hope of

_____

act currently in effect; however, none of the IDEA sections cited will change in any way material to this decision on July 1, 2005.

educational benefit."). Even as to findings of fact, the court retains the discretion, after careful consideration, "to accept or reject the findings in part or in whole." *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1985)).

5.     The burden of proof rests on the party challenging the hearing officer's decision. *See, e.g., Dobrowolski*, 976 F.2d at 54; *see also, e.g., Maine Sch. Admin. Dist. No. 35 v. Mr. and Mrs. R*., 176 F. Supp.2d 15, 23 (D. Me. 2001) (rec. dec., *aff'd* Feb. 27, 2002), *rev'd on other grounds*, 321 F.3d 9 (1st Cir. 2003) ("The party allegedly aggrieved must carry the burden of proving . . . that the hearing officer's award was contrary to law or without factual support.").

6.     As a threshold matter, the Parents contend that the Hearing Officer erred in upholding the District's determination that L.I. was ineligible for special education pursuant to the IDEA and relevant Maine state law. *See* Parents' Brief at 26-40. Broadly speaking, they argue that the Hearing Officer was wrong in two respects: She erred as a matter of law in deeming impact on academic performance necessary to a finding of "adverse effect on educational performance," and even assuming *arguendo* she was right in that interpretation, L.I. still should have been found eligible inasmuch as she "did suffer an adverse effect on her academic functioning as a result of her disabilities at the start of sixth grade." *Id*. at 27. The Parents also argue that (i) the District's section 504 offer was grossly insufficient and unnecessarily restrictive, violating L.I.'s Rehabilitation Act rights, (ii) the family is entitled pursuant to the IDEA to reimbursement of private-school expenses incurred since February 2004, and (iii) L.I. also is entitled pursuant to the IDEA to a compensatory-education remedy in the form of reimbursement of private-school expenses plus remedial services that would compensate for past deprivation of her rights. *See id*. at 40-50.

7.     The *amici curiae* warn that the decision of the Hearing Officer, if allowed to stand, would set a dangerous precedent, potentially depriving an array of disabled students of special-

education services for which they already have been, or should be, deemed eligible. *See generally* DRC Brief; Asperger's Brief. Their position is well-summarized in the following passage from the brief of the Disability Rights Center and the Autism Society of Maine:

> In this case, the hearing officer denied special educational services to a sixth-grade girl diagnosed with Asperger's Syndrome, a form of Autism. The hearing officer did not dispute the diagnosis but said that because the girl made academic progress she was not eligible for special education services. The hearing officer equated academic progress with educational performance. If allowed to stand, this decision will set a dangerous precedent and will adversely affect many students with disabilities, including those with autism, speech impairment, and emotional disability because those students will be improperly deemed ineligible for special education services. The hearing officer's decision creates a hurdle in the identification process that does not exist in the regulations or in the enabling statutes.

DRC Brief at 3 (footnote omitted).

8.     The District argues that the Parents and the *amici curiae* misconstrue the decision of the Hearing Officer, who considered adverse impact not only upon L.I.'s academic performance but also upon her school citizenship and behavior at school. *See* District Brief at 17-18. They additionally contend that (i) the Record supports the Hearing Officer's finding that L.I.'s disabilities did not adversely impact her educational performance, (ii) while L.I. unquestionably experienced a mental-health crisis at the beginning of her sixth-grade year, the difficulties she then encountered were too short-lived to qualify her for special education, (iii) alternatively, L.I. did not qualify for special-education services because she did not require them in order to benefit from the school program, (iv) assuming *arguendo* that the Hearing Officer erred in failing to identify L.I. as eligible for special education, the court should decline to order reimbursement of private-school tuition, and (v) the court should reject the family's section 504 claim on the basis of failure to exhaust administrative remedies and, alternatively, on its merits. *See id.* at 25-50.

9.      I accept the Hearing Officer's findings of fact, all of which are supported by the Record save in a couple of immaterial respects.  I have, however, liberally supplemented her findings of fact with select additional facts highlighted by the Parents and the District.

10.      The IDEA defines a "child with a disability," in relevant part, as "a child: (i) with . . . serious emotional disturbance (hereinafter referred to as 'emotional disturbance'), . . . autism, . . . [or] other health impairments . . .; and (ii) who, by reason thereof, needs special education and related services."   20 U.S.C. § 1401(3)(A).   "Special education" is defined as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, . . . including (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education."  *Id*. § 1401(25).

11.      Schools that receive federal funding are required to identify, locate and evaluate students who are in need of special education and related services. *See, e.g., id*. § 1412(a)(3)(A); Maine Special Education Regulations, Code Me. R. 05-071 ch. 101 ("MSER"), § 7 (describing Maine schools' "child find" obligations).[18]  Schools must provide such students with a free appropriate public education, or "FAPE," via an individualized education program, or "IEP," that is "reasonably calculated to enable the child to receive educational benefits[.]"  20 U.S.C. § 1412(a)(1) & (4); *Board of Educ. v. Rowley*, 458 U.S. 176, 207 (1982).

12.      The District does not dispute L.I.'s diagnoses of Asperger's and adjustment disorder. *See, e.g.*, District Brief at 16.  As the Asperger's Association of New England points out, *see* Asperger's Brief at 10, diagnostic criteria for Asperger's include: (i) a "[q]ualitative impairment in

---

[18]   "Related services" are defined as "transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to (*continued on next page*)

social interaction," such as "failure to develop peer relationships appropriate to developmental level," a "lack of spontaneous seeking to share enjoyment, interests, or achievements with other people" and/or a "lack of social or emotional reciprocity[,]" and (ii) "[r]estricted, repetitive and stereotyped patterns of behavior, interests, and activities," such as a "preoccupation with one or more stereotyped and restricted patterns of interest that is abnormal either in intensity or focus" and/or "apparently inflexible adherence to specific, nonfunctional routines or rituals[,]" American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV-TR") 84 (4th ed., text rev. 2000).   Asperger's "causes clinically significant impairment in social, occupational, or other important areas of functioning" but does not result in a "clinically significant general delay in language . . . [or] in cognitive development or in the development of age-appropriate self-help skills, adaptive behavior (other than in social interaction), and curiosity about the environment in childhood."  DSM-IV-TR at 84.

13.   On March 3, 2004 L.I.'s PET considered identifying her as eligible for special education under three possible categories: (i) autism, (ii) emotional disturbance and (iii) "other health impaired."  *See* Record at 53.  The majority of the PET rejected her identification on the basis that "evaluations indicate to school personnel no significant adverse effect on education."  *Id.*

14.   This, in turn, was a reference to the requirement that a child's disability "adversely affect[] educational performance" – a phrase that does not appear in the IDEA but rather "surfaces in an agency regulation promulgated under the authority of the IDEA." *Yankton Sch. Dist. v. Schramm*, 900 F. Supp. 1182, 1191 (D.S.D. 1995), *aff'd as modified*, 93 F.3d 1369 (8th Cir. 1996) (citing 34 C.F.R. § 300.7(b)(7)).  The current version of the regulation in question, promulgated by the Office of Special Education and Rehabilitative Services, Department of Education, requires the existence of an

---

assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling (*continued on next page*)

adverse effect on educational performance in order for a student to qualify as eligible under any of the

three categories considered by L.I.'s PET, among other categories.  *See* 34 C.F.R. § 300.7(c)(1), (4) &

(9).

> 15.     The regulation defines "autism" as:

> a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age 3, that adversely affects a child's educational performance.  Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.  The term does not apply if a child's educational performance is adversely affected primarily because the child has an emotional disturbance, as defined in paragraph (b)(4) of this section.

*Id*. § 300.7(c)(1)(i).  "A child who manifests the characteristics of 'autism' after age 3 could be

diagnosed as having 'autism' if the criteria in paragraph (c)(1)(i) of this section are satisfied."  *Id*.

§ 300.7(c)(1)(ii).

> 16.     "Emotional disturbance" is defined, in relevant part, as:

> a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

> (A)     An inability to learn that cannot be explained by intellectual, sensory, or health factors.

> (B)     An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

> (C)     Inappropriate types of behavior or feelings under normal circumstances.

> (D)     A general pervasive mood of unhappiness or depression.

> (E)     A tendency to develop physical symptoms or fears associated with personal or school problems.

*Id*. § 300.7(c)(4).

---

conditions in children."  20 U.S.C. § 1401(22).

17.     Finally, "other health impairment" is defined as:

having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that –

    (i)     Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, and sickle cell anemia; and

    (ii)     Adversely affects a child's educational performance.

*Id.* § 300.7(c)(9).

18.     In like vein, Maine special-education regulations define a "student with a disability," in relevant part, as an individual who has one or more of listed disabilities (which include autism, emotional disability and other health impairment) and "[h]as been evaluated according to these rules and has been determined to have a disability which requires the provision of special education and supportive services."   MSER §§ 3.1, 3.2, 3.5 & 3.10.   Maine's definitions of autism, emotional disability and other health impairment are virtually identical to those in the relevant federal regulation; again, all three require that the disability adversely affect educational performance.   *Compare* 34 C.F.R. §§ 300.7(c)(1), (4) & (9) *with* MSER §§ 3.2, 3.5 & 3.10.

19.     Neither the IDEA nor accompanying federal regulations defines the phrase "adversely affects educational performance," thereby "leaving it to each State to give substance to these terms." *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 66 (2d Cir. 2000).

20.     Maine's special-education regulations do not define the terms "adversely affects" or "adverse effect."   *See* MSER § 2.   However, they provide: "The term 'educational performance' includes academic areas (reading, math, communication, etc.), non-academic areas (daily life activities, mobility, etc.), extracurricular activities, progress in meeting goals established for the general curriculum, and performance on State-wide and local assessments."   *Id.* § 2.7.

21.     In Maine, the term "general curriculum" means "the school administrative unit's local curriculum for grades K-12 which incorporate[s] the content standards and performance indicators of the Learning Results." *Id*. § 2.11.  The Learning Results, in turn, are "a comprehensive, statewide system of learning results" based broadly upon six "guiding principles" and aimed at establishing "high academic standards at all grade levels in the [eight content] areas of math; English; science and technology; social studies, including history, economics and civics; career preparation; visual and performing arts; health and physical education; and foreign languages."  20-A M.R.S.A. § 6209.

22.     The six guiding principles direct that each student leave school as: (i) "[a] clear and effective communicator[,]" (ii) "[a] self-directed and life-long learner[,]" (iii) "[a] creative and practical problem solver[,]" (iv) "[a] responsible and involved citizen[,]" (v) "[a] collaborative and quality worker" who, *inter alia*, "[d]emonstrates reliability, flexibility and concern for quality" and (vi) "[a]n integrative and informed thinker[.]"  *Id*. § 6209(1).

23.     MEA tests are administered to Maine students in grades 4, 8 and 11 in large part to test and certify student mastery of the eight content areas of the Learning Results.  *See, e.g*., Instructional Program, Assessment and Diploma Requirements, Code Me. R. 05-071 ch. 127, § 4.

24.     I agree with the Parents and the *amici curiae* that the Hearing Officer erred, or at the least misspoke, in framing the question as "whether a school department is required to address social and emotional needs when there are *no* academic needs."  Hearing Decision at 8 (emphasis in original).  Relevant Maine regulations – which fill the IDEA regulations' definitional void with respect to the term "educational performance" – make clear that a student's eligibility for special-education services in this state does not hinge on whether his or her disability adversely affects an academic area (reading, math, communication, etc.).  *See* MSER § 2.7.

25.     As the Parents and the *amici curiae* suggest, *see* Parents' Brief at 29-34; DRC Brief at 4-6, Asperger's Brief at 4-6, Maine's broad definition of the term "educational performance" reflects and harmonizes with the recognition of both Congress and the Maine legislature that the purpose of education is not merely the acquisition of academic knowledge but also the cultivation of skills and behaviors needed to succeed generally in life, *see, e.g.,* 20 U.S.C. § 1400(d)(1)(A) (listing among purposes of IDEA "to ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs and prepare them for employment and independent living"); *Deal*, 392 F.3d at 863 (noting that "a key concern of and primary justification for the IDEA's predecessor was the desire to foster self-sufficiency in handicapped children"); *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990) ("purely academic progress – maximizing academic potential – is not the only indicia of educational benefit implicated" by the IDEA); *Corchado v. Board of Educ.*, 86 F. Supp.2d 168, 176 (W.D.N.Y. 2000) (satisfactory academic achievement "should not and cannot be the litmus test for eligibility under the IDEA" but rather is but one tool in determining whether a child has suffered an adverse effect on educational performance); *Mary P. v. Illinois State Bd. of Educ.*, 919 F. Supp. 1173, 1180 (N.D. Ill.), *amended on other grounds,* 934 F. Supp. 989 (N.D. Ill. 1996) ("'Educational performance' means more than a child's ability to meet academic criteria.  It must also include reference to the child's development of communication skills, social skills, and personality, as the Code, itself, requires.") (citing 34 C.F.R. § 300.533(a)(1)).[19]

---

[19] The District argues*, inter alia*, that a student must demonstrate adverse effect in *each* of the five areas listed in MSER § 2.7 to qualify for special-education services.  *See* District Brief at 24.  Nonetheless, the regulation states that the term "educational performance" *includes* the five listed areas, signaling that any one of them independently falls under the rubric of that overarching term. *See* MSER § 2.7.  To the extent there could be a doubt, the policy considerations driving federal and Maine special-education law, discussed above, dispel it.

26.     Nonetheless, in this case, I am persuaded that the Hearing Officer's error is harmless and her ultimate conclusion (that L.I. did not suffer an adverse effect upon educational performance) supported by a preponderance of the evidence.  As the District points out, *see* District Brief at 24-25, the Hearing Officer recognized the breadth of Maine's definition of "educational performance" and specifically addressed behavioral as well as academic considerations, determining that L.I. was able to complete homework independently, was well-behaved in class, was successful at test-taking and successfully completed projects, *see* Hearing Decision at 8.

27.     It is true that District personnel noted, beginning in L.I.'s fifth-grade year, that she was sad, isolating herself from peers and seemingly unduly upset by rules she perceived as unfair.  During that year L.I., a victim of teasing by peers, became increasingly resistant to continuing her education at Cornish.  However, this case is hardly analogous, as the Parents suggest, *see* Parents' Brief at 35, 37-38, to the cases of *In re Kristopher H*., 1985-86 EHLR DEC. 507:183, 507:187 (Wash. State Educ. Agency Sept. 4, 1985), in which a hearing officer disagreed with a school district's assessment that an emotionally disturbed child was not eligible for special education because he was performing at or near grade level on academic tests, or *Baltimore City*, in which a hearing officer reversed a school district's decision that a child with Asperger's and a record of academic success did not qualify for special education, *see Baltimore City*, 37 IDELR 210, at 928-30.

28.     In the case of *Kristopher H.*, while the student's behavior in the classroom was relatively unremarkable, he was disruptive on the school bus, showed a great deal of aggressiveness and hostility toward his peers in unstructured situations and demonstrated withdrawal and suspicion toward adults. *Kristopher H*., 1985-86 EHLR DEC. at 507:183.  The hearing officer held: "[W]hen we have a child who is hostile, aggressive, withdrawn in personal relationships with both teacher and

peers, is isolated in the classroom and whom a psychiatrist has diagnosed as being close to being institutionalized, that child is certainly not being educated." *Id*. at 507:187.

29.     In the case of *Baltimore City*, the student had demonstrated not only exceptional academic abilities but also significant social and emotional problems throughout his school career. *See Baltimore City*, 37 IDELR 210, at 927.  He was described as follows:

> He has difficulty making and sustaining friendships because he does not understand non-verbal communication, such as facial expressions and gestures, he takes literally comments made in jest and his reactions are often exaggerated, in addition, he taunts and teases other students and makes faces, weapon gestures and blows in other's [sic] faces.  He has sudden outbursts during class and, at times, does not follow the protocol for class participation, causing negative peer reactions.  He has made progress in refraining from calling out the answers in class before giving the other students an opportunity to answer.  He has difficulty working with other students and listening to others without interrupting.

*Id*.  Moreover, the child frequently engaged in behaviors that resulted in in-school and out-of-school suspensions and on one occasion was suspended for three days for throwing a chair at another student. *See id*.  The hearing officer found the school district's determination that the child's disability had no adverse impact on his educational performance "unsupported by the evidence[,]" ruling: "He clearly has pragmatic language, organizational, attentional, social cognition and other needs that must be addressed in order for him to access . . . the general curriculum.  Without special instruction to address these needs the Child will be unable to function in a classroom setting."  *Id*. at 930.[20]

30.     In this case, by contrast, the Record evidence by and large paints a picture of a child who – but for the period encompassing the fall of her sixth-grade year – excelled academically, met the standards of the content areas of the Learning Results, communicated her views skillfully in writing and orally, participated thoughtfully in class, obeyed rules even when she did not agree with them, was

---

[20] Similarly, in *Venus Indep. Sch. Dist. v. Daniel S*., No. CIV.A 301CV1746P, 2002 WL 550455 (N.D. Tex. Apr. 11, 2002), the District Court for the Northern District of Texas ruled that a child whose "academic performance was well above average" was eligible for special-education services when the child had received more than twenty in- and out-of-school suspensions and had engaged in (*continued on next page*)

not rude or otherwise a school disciplinary problem and maintained some close friends, albeit either "misfit boys" or those who shared her special interest in Japanese anime.

31.     As the District correctly observes, *see* District Brief at 16, a diagnosis alone does not qualify a student as eligible for special-education services, *see, e.g., Norton v. Orinda Union Sch. Dist.*, No. 97-17029, 1999 WL 97288, at \*\*2 (9th Cir. Feb. 25, 1999); *Doe v. Belleville Pub. Sch. Dist. No. 118*, 672 F. Supp. 342, 345 (S.D. Ill. 1987).   While a child's impairment need not necessarily manifest itself in academic failure, as the Hearing Officer incorrectly suggested, it must, as in *Kristopher H.* and *Baltimore City*, manifest itself in an adverse effect on the child's ability to learn. *See, e.g., González v. Puerto Rico Dep't of Educ.*, 254 F.3d 350, 352 (1st Cir. 2001) ("Educational benefit is indeed the touchstone in determining the extent of governmental obligations under the IDEA. Thus we have said, for example, that the Act does not require a local school committee to support a handicapped child in a residential program simply to remedy a poor home setting or to make up for some other deficit not covered by the Act.") (citations and internal quotation marks omitted); *Rome Sch. Comm. v. Mrs. B*, 247 F.3d 29, 33 n.3 (1st Cir. 2001) ("The question is whether these behavioral disturbances interfered with the child's ability to learn.").

32.     The Record supports, by a preponderance of the evidence, a finding that both prior to and subsequent to L.I.'s mental-health crisis in the fall of 2003 her disabilities did not adversely affect her performance in (i) academic areas (reading, math, communication, etc.), (ii) non-academic areas (daily life activities, mobility, etc.), (iii) extracurricular activities, (iv) progress in meeting goals established for the general curriculum or (v) performance on State-wide and local assessments.[21]

---

behavior that was a constant challenge to himself, his teachers and his parents. *See Venus*, 2002 WL 550455, at \*11.

[21] As broad as is Maine's definition of "educational performance," it must be read against the backdrop of the First Circuit's teachings in *González* and *Rome School Committee*.  Thus, for example, impact on non-academic areas such as daily life activities and mobility would be relevant only to the extent it interfered with a child's ability to learn.

33.     As to the first category – academic areas – there is no evidence that prior to or after the fall of 2003 L.I.'s disabilities adversely affected her performance; rather, she excelled.  At her lowest point prior to sixth grade, she still received a mixture of As and Bs and made the honor roll.  As a sixth-grader enrolled at TCS commencing in January 2004, she was able to handle academic work at the level of seventh grade and higher with ease and distinction.

34.     As to the second and third categories – (i) non-academic areas (daily life activities, mobility, etc.) and (ii) extracurricular activities – the Parents, who bear the burden of proof in this appeal, make no specific argument that L.I.'s impairments manifested themselves in deficits in those areas.  *See* Parents' Brief at 33-38 (noting, but making no specific arguments regarding, these categories of MSER § 2.7); Plaintiff's [sic] Reply Memorandum of Law ("Parents' Reply Brief") (Docket No. 33) at 7-8 (noting, but making no specific arguments regarding, categories of MSER § 2.7; arguing generally that there can be no doubt that L.I. suffered adverse impact on educational performance given that "[s]he suffered for years due to isolation and frustration, was so unhappy at school that she begged not to attend school for years on end, refused to complete assignments and was unable to meet the most basic standards of classroom performance, and ultimately attempted suicide.").

35.     The fourth and fifth categories – (i) progress meeting goals established for the general curriculum and (ii) performance on statewide and local assessments – implicate L.I.'s academic performance and conduct as reflected in report cards, her performance on MEA testing and her general mastery of the eight content areas of the Learning Results (which, as explained above, are the goals established for the general curriculum in Maine).[22]  From all that appears, she suffered no disability-

---

[22] L.I.'s report cards reflected more than purely academic performance.  For example, in fifth grade L.I. received mostly "v+" grades in social and work skills, including "[d]emonstrates respect and cooperation[,]" and "[a]ccepts suggestions and criticism well."  Record at 93.  At TCS, she was commended as an "eager and important" member of her French class.  *See id.* at 345.

33

caused "adverse effect" in these areas either prior to sixth grade or once enrolled at TCS.  During those time frames, her report cards were exceptional and she met standards on MEA testing.  The Parents identify no deficiency in the eight content standards of the Maine Learning Results (career preparation, English language arts, foreign language, health and physical education, mathematics, science and technology, social studies, and visual and performing arts).  *See* Parents' Brief at 33-38; Parents' Reply Brief at 7-8.

36.     The Parents do suggest that L.I.'s educational performance, as measured by at least one of the six aspirational Learning Results guidelines, was adversely impacted.  *See, e.g.*, Parents' Brief at 33 (noting, *inter alia*, that "the Learning Results seek to create a student who can be a 'collaborative and quality worker,' and who '[d]emonstrates reliability, *flexibility* and concern for quality.") (quoting 20-A M.R.S.A. § 6209(1)(E)) (emphasis added by Parents).  Although the goals of the six guidelines are intended to infuse the curriculum, technically they are not themselves the "general curriculum" and thus would seem not to fall within the purview of MSER § 2.7.  Nonetheless, even taking them into account, on the whole the evidence indicates that L.I. was meeting, and in some cases excelling with respect to, the guidelines.

37.     As the District argues, *see* District Brief at 27-28, L.I. fairly can be said to have excelled, rather than to have exhibited disabled skills, in the guideline category of "[a] responsible and involved citizen" who, *inter alia*, "[r]ecognizes the power of personal participation to affect the community and demonstrates participation skills[,]"  20-A M.R.S.A. § 6209(1)(D)(1).  Both at Cornish and at TCS, she was not afraid to dissent from rules and views with which she disagreed, and was capable of doing so in a thoughtful and mature manner.  The same can be said of the guideline category of "[a] clear and effective communicator[,]" 20-A M.R.S.A. § 6209(1)(A), particularly as concerns L.I.'s superior writing ability.  Even with respect to the guideline category singled out by the

Parents, while L.I. had difficulties in the areas of being a collaborative worker and demonstrating flexibility, her deficits were not such as to render her a school discipline problem or otherwise to interfere with her ability to learn or that of her classmates.[23] She did well in other areas addressed by that guideline: reliability and quality of work. *See* 20-A M.R.S.A. § 6209(1)(E).

38.     I turn to the period of L.I.'s crisis in the fall of 2003. During that time, in a misguided attempt to fit in better with her peers, she deliberately tried to do badly in school. She missed four school days in September and was not completing assignments. She absented herself for lengthy periods during math class, during which time she evidently was cutting herself in the bathroom. Her attitude was poor: Her teacher felt she was unable to reach her. Ultimately, she attempted suicide. There is evidence that the etiology of this crisis, at least in part, was L.I.'s Asperger's and depression. The Parents posit, and the Record largely corroborates, that "by sixth grade [L.I.] was not even able to meet basic standards of performance at her public school. By the time of her suicide attempt in the fall of 2003, LI was not completing homework assignments, was not participating in class, and was in danger of failing her classes." Parents' Reply Brief at 9-10.

39.     Is a period of crisis during which there is deterioration in a student's social skills and conduct as well as academic performance sufficient to constitute an adverse effect on educational performance, rendering a student eligible for special education? The District argues persuasively that in this case it is not. As the District points out, *see* District Brief at 37, L.I. quickly realized that what she had done in attempting suicide was wrong, *see* Transcript at 42 (Northrop testimony). She was released to her family without any extended hospitalization. *See* Record at 374. She never thereafter returned to a District school; however, as the District suggests, *see* District Brief at 37-39, her

---

[23] As the District points out, *see* District Brief at 29 n.17, although the family suggests that L.I.'s difficulty with school rules reveals a disability-based rigidity, *see, e.g.*, Parents' Brief at 34, Mrs. I. herself was critical of the same school practices and rules that upset L.I., *see, e.g.*, Transcript at 121-22, 127, 137-39, 151-52. In any event, even assuming *arguendo* that L.I.'s attitudes were (*continued on next page*)

parents' argument that beginning October 1, 2003 she was unable to attend a District school for disability-related reasons, *see* Parents' Brief at 40; Parents' Reply Brief at 7 ("L.I. . . . simply was emotionally unavailable for regular public school attendance after her suicide attempt in 2003."), proves too much.  As the Hearing Officer found:

> [N]o one suggested that Student has a school phobia that renders her emotionally *incapable* of attending a district school.  Neither Dr. Popenoe, nor Ms. Northrop, rendered any opinion on whether, for mental health reasons, Student needs to be placed in a small, private school.  Nor did either of them suggest that Student could not be successfully educated in public school.

Hearing Decision at 8 (emphasis in original); *see also, e.g.*, Record at 125 (MMC note stating that L.I. was to be out of school for two days); Transcript at 74 (Northrop testimony) (no opinion whether return to public school contraindicated), 496, 532-33 (testimony of psychologist Ellen Popenoe) (L.I. could move back into "mainstream" setting with right supports, transition time).

40.     What is more, while MMC's social worker instructed the Parents to make a promise to L.I. that would make a positive difference in her life, she did not tell them what to promise.  They chose to promise L.I. explicitly that she would not have to return to Cornish and implicitly that she could attend TCS, the private school her older sister attended that she herself had previously expressed interest in attending.  Thus, the Record evidence supports the District's assertion that "[b]ecause of this family agreement, . . . no conclusion at all should be drawn from her failure to return to public school."  District Brief at 38; *see also, e.g., Katherine S. v. Umbach*, No. CIV.A 00-T-982-E, 2002 WL 226697, at *13 (M.D. Ala. Feb. 1, 2002) ("The plaintiffs also argue that the due-process hearing officer ignored the obvious conclusion that Katherine *was* experiencing an educational impact since her emotional disabilities are so 'severe and complex' that she could not safely attend school.

---

disability-related, she obeyed the rules with which she disagreed.

36

This argument is weakened by the fact that it was Mr. and Mrs. S. who testified that they would not have allowed Katherine to return to school in any event.") (emphasis in original).[24]

41.     What of the period of time in September 2003?  As to that time frame, the District argues – again persuasively – that, although admittedly serious, L.I.'s crisis was not of sufficient duration to trigger eligibility for special-education services.  *See* District Brief at 36.  As the District points out, *see id.* at 37, courts have recognized that a student undergoing an emotional or mental-health crisis does not necessarily qualify for special education, *see, e.g., Umbach*, 2002 WL 226697, at *11-*12.  This is implicit in the definition of the disability of "emotional disturbance," which contemplates "a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree[.]"  34 C.F.R. § 300.7(c)(4).

42.     For the foregoing reasons, I conclude that neither the District nor the Hearing Officer erred in determining that L.I. was ineligible for special-education services on the basis of lack of adverse effect on educational performance.  Inasmuch as the District did not violate L.I.'s rights pursuant to the IDEA and Maine special-education law in declining to identify her as eligible for special-education services, the family is not entitled to reimbursement of tuition paid to TCS, and L.I. is not entitled to compensatory-education remedies.[25]

43.     I turn finally to the Parents' separate contention that the District's offered section 504 plan was sufficiently deficient to have violated L.I.'s Rehabilitation Act rights.  *See* Parents' Brief at 40-41.  The District rejoins, and I agree, that the Parents failed to exhaust administrative remedies with respect to this claim.  *See* District Brief at 48-50.

---

[24] The District did not help matters in the fall of 2003 by promising L.I. a tutor and then failing either to supply one or to extend to the Parents the courtesy of an explanation for the default.  Nonetheless, this blunder has no bearing on the instant analysis.

[25] I need not, and do not, reach the District's alternative argument (which the Hearing Officer also did not reach) that L.I. is ineligible for special-education services on the ground that she does not require such services to receive a beneficial education.  *See* Parents' Brief at 40 n.9; District Brief at 39-42.

44.     "The Rehabilitation Act was enacted to promote, among other things, the inclusion and integration of persons with disabilities into mainstream society." *J.D.*, 224 F.3d at 70.  To that end, section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"  29 U.S.C. § 794(a).

45.     In the education field, the Rehabilitation Act has been described as "complement[ing]" the IDEA.  *J.D.*, 224 F.3d at 70.  Whereas the IDEA "require[s] federally funded State and local educational agencies to provide special education and related services to students who meet specified eligibility criteria, § 504 of the Rehabilitation Act prohibits such agencies from discriminating against students with disabilities."  *Id*.  "Both § 504 and IDEA have been interpreted as requiring states to provide a free appropriate public education to qualified handicapped persons, but only IDEA requires development of an IEP[.]"  *Yankton Sch. Dist. v. Schramm*, 93 F.3d 1369, 1376 (8th Cir. 1996) (footnote omitted).

46.     The confluence of section 504 of the Rehabilitation Act and the IDEA is recognized in the IDEA itself, which provides, in relevant part:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under . . . title V of the Rehabilitation Act of 1973 [29 U.S.C.A. § 791 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(*l*).  Subsection (f) provides for a due-process hearing by a local or state educational agency, *see id*. § 1415(f); subsection (g) affords a right of appeal from the local to the state educational-agency level, *see id*. § 1415(g).  Thus, as the First Circuit has observed, "IDEA requires

recourse to this due process hearing when plaintiffs seek relief available under subchapter II of IDEA even if the suit is brought pursuant to a different statute[.]" *Weber v. Cranston Sch. Comm.*, 212 F.3d 41, 49 (1st Cir. 2000); *see also, e.g., Fitzpatrick v. Town of Falmouth*, 324 F. Supp.2d 95, 96 (D. Me. 2004) ("[T]he IDEA specifies that before filing a lawsuit under any federal law that protects the rights of children with disabilities, a plaintiff must first exhaust the administrative remedies that the IDEA provides, at least if the relief requested is also available under the IDEA.").

47.     The District contends that inasmuch as the Parents' section 504 claim is for a denial of FAPE and rests upon the same factual pattern as their IDEA claim, the Parents should have raised it at the administrative-hearing level.  *See* District Brief at 48-49.  The District points out that they did not do so, as a result of which neither side presented evidence on the appropriateness of the section 504 plan in meeting L.I.'s needs.  *See id.* at 49; *see also, e.g.*, Record at 8 (hearing request), 289 (family's pre-hearing statement of issues).

48.     The Parents neither contest the District's characterization of their section 504 claim as one for denial of FAPE nor deny that they did not raise this issue below.  Instead, they rejoin that (i) section 504 does not contain an exhaustion requirement, (ii) they could not have raised a section 504 claim below because Maine's IDEA due-process officers do not have authority to rule on section 504 claims, and (iii) a plaintiff with potential claims under both statutes need only exhaust IDEA remedies prior to bringing a section 504 claim in federal court, and they did so.  *See* Parents' Reply Brief at 15.

49.     The Parents' first argument, even assuming *arguendo* its correctness, does not get them very far.  To the extent that exhaustion of their section 504 claim was required by the IDEA, the fact that they would not have been required to exhaust a standalone section 504 claim is irrelevant.

50.    The Parents' next contention is a species of futility argument: that they could not have exhausted their section 504 remedies below because the Hearing Officer was not empowered to hear such claims.  *See id.*; *see also, e.g., Weber*, 212 F.3d at 52 ("[T]here are exceptions to the IDEA exhaustion requirement based on the concept of futility.  A plaintiff does not have to exhaust administrative remedies if she can show . . . that the administrative remedies afforded by subchapter II of IDEA are inadequate given the relief sought.  This latter form of futility overlaps with the 'relief available' language of § 1415(*l*) in the sense that relief is not available within the meaning of § 1415(*l*) if the due process hearing provided by subchapter II of IDEA does not provide relief that addresses the claim of the complainant.") (citation and footnote omitted).

51.    For the proposition that hearing officers in Maine are not empowered to adjudicate Rehabilitation Act claims, the Parents cite section 13.1 of the MSER.  *See* Parents' Reply Brief at 15. That section nowhere states that a hearing officer may entertain only IDEA claims; rather, it provides, in pertinent part: "A parent or school unit may submit a written request for a due process hearing to the Department when there is a disagreement regarding the identification, evaluation, placement or the provision of a free appropriate public education to a student[.]" MSER § 13.1.  While this language tracks the requirements of the IDEA, *see, e.g.*, 20 U.S.C. § 1412(a)(1)-(5), the Parents overlook the fact that it simultaneously tracks the subject matter of Rehabilitation Act claims in school cases, *see, e.g., Brougham ex rel. Brougham v. Town of Yarmouth*,  823 F. Supp. 9, 13 n.4 (D. Me. 1993) ("Because both the IDEA and section 504 of the Rehabilitation Act are built around fundamental notions of equal access to state programs and facilities, their substantive requirements, as applied to the rights of a handicapped child to a public education, have been interpreted to be strikingly similar. In regulations promulgated pursuant to section 504, the Secretary of Education has interpreted section 504 as requiring a recipient of federal funds that operates a public elementary or secondary education

program to provide a free, appropriate public education to each qualified handicapped person in the recipient's jurisdiction.") (internal punctuation omitted) (citing 34 C.F.R. § 104.33(a)).[26]

52.     Beyond this, the Record in this case indicates that the District provides a section 504 notice that lists, among parent/student rights, the right to "[r]equest mediation or an impartial due process hearing related to decisions or actions regarding your child's identification, evaluation, educational program, or placement."  Record at 44-45.

53.     Count II of the Parents' complaint, which sets forth their Rehabilitation Act claim, asserts that the District's 504 plan "fail[ed] to meet [L.I.'s] individual needs as adequately as the needs of non-handicapped persons are met and fail[ed] to provide her with a free appropriate public education in the least restrictive environment, in violation of 29 U.S.C. § 794 and 34 C.F.R. § 104.33."  Complaint ¶ 67.  The Parents thus assert a FAPE claim that would have been cognizable before the Hearing Officer pursuant to MSER § 13.1.  Their futility argument accordingly is without merit.

54.     I turn to the Parents' final argument.  As they suggest, *see* Parents' Reply Brief at 15, a plaintiff with section 504 and IDEA claims need only exhaust remedies pursuant to the IDEA before bringing a claim in federal court,  *see, e.g., Weber*, 212 F.3d at 53 ("IDEA's mandate is explicit: plaintiffs must exhaust IDEA's impartial due process hearing procedures in order to bring a civil action under subchapter II of IDEA or any 'such law[] seeking relief that is also available' under subchapter II of IDEA.").  They contend that they satisfied this requirement inasmuch as they did, in fact, avail themselves of an IDEA due-process hearing.  *See* Parents' Reply Brief at 15.  However,

---

[26] The section 504 regulation cited in *Brougham* provides, in pertinent part: "A recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap. . . .  For the purpose of this subpart, the provision of an appropriate education is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(a) & (b)(1).  Section 104.36 requires implementation of a series of procedural safeguards, including impartial hearings, in section 504 cases; it notes that compliance with the IDEA's panoply of procedural safeguards is "one means of meeting this requirement."  34 C.F.R. § (*continued on next page*)

merely availing oneself of a hearing does not necessarily exhaust remedies with respect to a specific claim.  The Parents could have, but did not, present their section 504/denial of FAPE claim to the Hearing Officer.  As a result, neither side developed evidence regarding the claim, and the Hearing Officer did not pass on it.  This is precisely the type of situation the IDEA exhaustion requirement was designed to avoid.  As this court has observed:

> There is a reason for the [IDEA] exhaustion requirement. . . .  The provision of judicial review is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.  Allowing plaintiffs to bypass the IDEA's administrative process en route to state or federal court disrupts this carefully calibrated balance and shifts the burden of factfinding from the educational specialists to the judiciary.  That phenomenon is directly at odds with the method of the IDEA: to allow parents to come directly to federal courts will render the entire scheme of the IDEA nugatory.

*Fitzpatrick*, 324 F. Supp.2d at 100 (citation and internal punctuation omitted).

55.    Inasmuch as the Parents could have, but did not, present their section 504 claim during the proceedings below, they failed to exhaust their administrative remedies with respect to it.  *See, e.g., Rafferty v. Cranston Pub. Sch. Dist.*, 315 F.3d 21, 25-26 (1st Cir. 2002) (IDEA plaintiff was barred from bringing claims raised for first time in District Court).

### III.  Conclusion

For the foregoing reasons, I recommend that the instant appeal be **DENIED**.

### ***NOTICE***

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

---

104.36.

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 13th day of June, 2005.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge