# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | | |
|---|---|---|
| MR. AND MRS. I, | ) | |
| | ) | |
| PLAINTIFFS | ) | |
| | ) | |
| v. | ) | CIVIL NO. 04-165-P-H |
| | ) | |
| MAINE SCHOOL ADMINISTRATIVE | ) | |
| DISTRICT 55, | ) | |
| | ) | |
| DEFENDANT | ) | |

# MEMORANDUM DECISION AND ORDER

## I. INTRODUCTION

This lawsuit is a dispute over a school district's obligation to provide special education services. The case is unusual because the pupil generally did well academically in early public schooling, without any special education services. She did demonstrate some developing social and communication issues in Grades 4 and 5. But her condition, Asperger's Syndrome and a depressive disorder, was diagnosed only as a result of her serious suicide attempt in 2003 as an 11-year-old at the beginning of Grade 6. Her parents then requested special education services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. (2000). The School District denied the request. Instead, the School District offered accommodations under Section 504 of the Rehabilitation Act ("§ 504"), 29 U.S.C. § 794 (2000).[1]

---

[1] A number of factors may affect a school district's or a parent's judgment as to which statute is more desirable including funding, identification and scope of services, and the sometime stigma of special
*(continued next page)*

Focusing on the 11-year-old's academic achievement and her nondisruptive classroom behavior, the Hearing Officer upheld the School District's decision, concluding that the pupil's condition had not adversely affected her educational performance and that the events of the fall of 2003 were only a short-term mental health crisis.   As the Magistrate Judge concluded, however, the Hearing Officer defined "educational performance" too narrowly, using only academic components. The Magistrate Judge ruled that the Hearing Officer's error was harmless.  But after reviewing the entire record and hearing oral argument, I disagree.   I conclude that the record establishes that the student's condition did adversely affect her educational performance as Maine defines that term and that the events of the fall of 2003 cannot be isolated from the pupil's underlying condition.  I direct the School District to reconvene its Pupil Evaluation Team to develop an appropriate Individualized Education Program.   Separately, I conclude that although the IDEA requires the parents to exhaust their IDEA administrative remedies before pursuing a § 504 claim in court, they are not required to argue their §504 claim to the Hearing Officer.  The § 504 claim, however, fails ultimately on the merits.

## II.  ASPERGER'S SYNDROME

Asperger's Syndrome ("AS") is a clinically recognized pervasive developmental disability.  Its symptoms include "limited interests or an unusual preoccupation with a particular subject to the exclusion of other activities[,] repetitive routines or rituals[,] peculiarities in speech and language[,] . . . the inability to interact successfully with peers[,] . . . [and] problems with non-verbal communication."  Nat'l

---

education.  See Robert A. Garda, Jr., Untangling Eligibility Requirements under the Individuals with Disabilities Education Act, 69 Mo. L. Rev. 443-47 (2004).

2

Inst. of Neurological Disorders & Stroke, Nat'l Inst. of Health, Pub. No. 05-5624, Asperger Syndrome Fact Sheet (2005), *available at* http://www.ninds.nih.gov/disorders/asperger/detail_asperger.htm ("NINDS Fact Sheet"). It is an autism spectrum disorder, "one of a distinct group of neurological conditions characterized by a greater or lesser degree of impairment in language and communication skills, as well as repetitive or restrictive patterns of thought and behavior." Id. Asperger's is marked by structural and functional differences in brain functioning. Id. Although intervention may be beneficial, especially when it is provided early, id., Asperger's Syndrome is continuous and lifelong. Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders: DSM-IV § 299.80 (4th ed. 1994) ("DSM-IV") ("[I]t is a permanent condition that is not treatable with medication." Greenland Sch. Dist. v. Amy N., 358 F.3d 150, 154 (1st Cir. 2004).)

The school setting often is very challenging for AS students, but not because Asperger's Syndrome causes reduced intellectual or academic skills: the diagnostic criteria recognize that AS students are not delayed at all in cognitive ability. DSM-IV, supra, § 299.80; see also Nat'l Autistic Soc'y, A School's Guide to Asperger Syndrome Information Sheet (2004) *available at* http://www.nas.org.uk (follow "site map" hyperlink; then follow "A to Z list of NAS information sheets" hyperlink; then follow "A School's Guide to Asperger Syndrome" hyperlink) ("Sch.'s Guide to AS") ("low average to higher IQ" typical). In fact, because of an often exhaustive interest in a limited subject, an AS student may seem like a "little professor." NINDS Fact Sheet, supra.

Instead, school tends to be challenging for students with Asperger's Syndrome because of their social impairments. They may be "isolated because of their poor

social skills and narrow interests . . . [even when they] approach other people . . ." Id.   Indeed, these social problems may not become apparent until a child enters school.   DSM-IV, supra.   Treatment goals at school should recognize that children with AS exhibit a continuum of strengths, weaknesses, and functionality levels, for "[e]ach pupil with the diagnosis will be different."   Sch.'s Guide to AS, supra.   Even after treatment as children, adults with Asperger's Syndrome may always find social situations and personal relationships challenging, and may continue to require encouragement and support to live independently.   NINDS Fact Sheet, supra.

### III.  FACTS

I reproduce in an Appendix the facts found by the Hearing Officer.   The parties color them differently; the Magistrate Judge has added to them, in part because of evidence submitted to the court but not to the Hearing Officer.   But there are no serious disagreements.   I give only a brief summary here.

L.I. was born in January, 1992.   She attended Hiram Elementary School for Kindergarten and Grade 1.   Mar. 8 Meeting Minutes ("Mar. 8 Mins."), Record ("Rec.") at 312-13; Due Process Hr'g Tr., Mrs. I. Test., Rec. at 595-96.   She then enrolled at Cornish Elementary School in Grade 2.   She performed well academically, but in Grade 4 began exhibiting "emotional issues, including anxiety and sadness, as well as difficulties with peer relationships."   Special Education Due Process Hearing Decision ("Hearing Decision" or "Hr'g Dec."), Rec. at 553.   In the summer of 2002, before Grade 5, she began asking her mother to let her be home-schooled.   In Grade 5, her teacher saw "signs of depression," distancing behavior and other social issues.   Id.   School counseling, outside counseling, and Prozac did not help.   During this time, her friends were limited to a very narrow group of boys, and one female

4

friend who shared L.I.'s special interest in Japanese anime, a popular form of animation art that has a number of websites, fan clubs, and magazines.

During the autumn of 2003 in Grade 6, L.I. tried to change her appearance, her clothing and her study habits (i.e., she decided to do worse academically) in an effort to fit in. She also began missing school. Her teacher observed "difficulties with peer relationships, perhaps due to a 'serious lack of awareness of the social and emotional 'state' of her peers and perhaps adults.'" Id. at 553-54. At a parent teacher conference her mother noticed red cuts or scratches on her arms. The teacher said that the student, then 11, had been taking prolonged bathroom breaks and might have been "carv[ing] into her arms" in the bathroom. Id. at 554. The teacher and mother, unhappy with the student's new study habits, proposed a "contract" to have L.I. complete her assignments satisfactorily.

When signing the contract was imminent, L.I. remained home from school for additional days, and then attempted suicide by an overdose of various medications. At the hospital, the assigned social worker told the parents that in order to produce a positive impact on L.I.'s emotional functioning, they would have to promise her that something would change. Since she had been telling hospital personnel that she hated school, her parents told L.I. that she would not have to return to Cornish Elementary School. The family notified Cornish Elementary of the suicide attempt and that L.I. would not return immediately.

At the initial Pupil Evaluation Team ("PET") meeting on October 10, 2003, the School District offered tutoring services of 10 hours per week outside school until the PET could review expert findings and recommendations. Although the parents pursued the offer, the School District never delivered the promised tutor. The family

5

tried home schooling, but it was unsuccessful.  Eventually, in January, 2004, the family placed L.I. at her sister's private school (the Community School[2]) on a part-time, trial basis.  Around that time, the parents sent the School District a letter pointing out its failure to provide a tutor, and stating that L.I. would be beginning private school.  In early February, 2004, L.I. began attending the Community School four days a week.  Just before that time, the parents sent another letter to the School District stating that they were "planning to enroll" L.I. in a private school, and referring to District payment.  Magistrate Judge's Recommended Findings of Fact & Conclusions of Law ("Recommended Decision" or "Rec. Dec.") at 14 (Docket Item 40).

> A new PET meeting on March 3, 2004

>> reached consensus on Student's dual diagnoses of Asperger's Syndrome and Adjustment Disorder with Depressed Mood. There was also consensus that Student needed social skills and pragmatic language instruction and access to a program that recognizes her cognitive strengths. The team determined, however, that Student did not qualify for special education services *since there was no adverse impact on her academic progress.*

Hr'g Dec., Rec. at 556 (emphasis added).  On March 8, 2004, the team offered § 504 accommodations instead ("close supervision, two hours per week of speech/language therapy services [ ], two half-hour sessions of social services per week and access to the district 'Gifted and Talented' offerings.  If necessary, Student could be

---

[2] According to the Hearing Officer:

> The Community School is not an approved special education placement.  It is a small school, with an 8:1 student-teacher ratio.  The school currently enrolls one publicly placed student with Asperger's Syndrome and had previously enrolled other students with various disabilities.

Hr'g Dec., Rec. at 556.

tutored by an education technician for three hours a day at home while she made a gradual transition back to public school," id.)   The family turned down the §504 offer and requested a due process hearing.

At the Community School, L.I. has "made excellent progress in all her classes and, over time, developed some positive peer relationships, all the while becoming less withdrawn and isolated from her peers."   Id.   But as the Magistrate Judge found based on additional evidence presented in court, despite this limited success, L.I.'s social interactions still continue to be impaired.   See Rec. Dec. at 19-20. During the 2004-2005 school year, her peer relationships centered almost exclusively on her interest in Japanese anime, and she shunned contact outside school.   Id.   Over the summer of 2004 L.I. spent "nearly all waking hours" at the computer engaging in anime-related role-playing, instant messaging, and "fan fiction" writing.   Id. at 19.   She left the computer only to use the bathroom.   Id. During this time, despite her mother's efforts, she resisted personal or even telephone interaction with her Community School peers.   Id.   She had in-person contact with her Community School peers during the summer of 2004 only twice, once at an anime convention and once while watching videos all night long.   Id.   She also resisted invitations from Cornish Elementary students, although she saw one former classmate once.   Id.   In addition, she refused to invite a friend to a family beach vacation because it would have "interfered" with her ability to watch an entire anime television series.   Id.   Due to AS, she has developed other new inflexible behaviors such as travel restrictions (refusing to go outside except to get into or out of a vehicle) and food restrictions (limiting her diet exclusively to pizza, carrots, red pepper, macaroni and cheese, and milk).   Id. at 20.   Her new therapist finds L.I.'s

7

peer relationships to be "atypical," because they are "based upon her special interest rather than the qualities of her peers," and "lack of shared emotional experiences." Id.

As a result of the due process hearing, the Hearing Officer upheld the School District's decision that L.I. did not qualify for special education under the IDEA and the family brought this lawsuit.

## IV.  IDEA ELIGIBILITY

Examination and testing arising out of L.I.'s suicide attempt produced a diagnosis of Asperger's Syndrome and Adjustment Disorder with Depressed Mood. That diagnosis stands unchallenged.  See Def.'s Mem. of Law ("Def.'s Mem.") at 16 (Docket Item 30); Pls.' Mem. of Law (Pls.' Mem.") at 2 (Docket Item 20); Hr'g Dec., Rec. at 557; see also Rec. Dec. at 24.

What is disputed is whether L.I. is a "child with a disability" under Federal and State definitions, and thus qualified for special education services under the IDEA.  See 20 U.S.C. § 1412(a)(1)(A) (State is obligated to provide services to "children with disabilities").  Specifically, a child must have one of several enumerated conditions, and "by reason thereof, need[] special education and related services."  20 U.S.C. § 1401(3)(A).

Relevant qualifying conditions include "autism," "serious emotional disturbance," and "other health impairments."  Id.  The parties agree that L.I.'s condition fits within those enumerated.  But regulations of the Office of Special Education and Rehabilitative Services, Department of Education, add an additional requirement: the qualifying condition must "adversely affect[] a child's educational performance."  34 C.F.R. § 300.7(c)(1), (4), (9) (2004).  Maine regulations require the

8

same adverse effect.  See Maine Special Education Regulations, 05 071 CMR 101-15 - 101-17 ("MSER") §§ 3.2, 3.5, § 3.7 (1999).

In this lawsuit, the parties dispute (1) whether L.I.'s condition adversely affects her educational performance, and (2) whether she needs special education and related services as a result.

I summarize the burden of persuasion, the standard of review and the definitions of terms before assessing L.I.'s particular situation.

**(A)  Burden of Persuasion**

The burden of persuasion lies upon the parents, the parties challenging the School District's decision.  See Schaffer ex rel. Schaffer v. Weast, ___ U.S. ___, 126 S. Ct. 528, 531 (2005).

**(B)  Standard of Review**

The IDEA statutory language does not establish a particular standard for me to use in reviewing the Hearing Officer's decision.  It states that a reviewing court shall "receive the records of the administrative proceeding; . . . hear additional evidence at the request of a party; and . . . basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(B).  The First Circuit has held that the weight owed the administrative record "must be left to the discretion of the trial court," because "Congress intended courts to make bounded, independent decisions."  Town of Burlington v. Dep't of Educ., 736 F.2d 773, 791-92 (1st Cir. 1984), aff'd, 471 U.S. 359 (1985).  Agency factual findings are neither binding nor irrelevant: "in recognition of the expertise of the administrative agency, [the court] must consider the findings carefully and endeavor to respond . . . to the resolution of each material

9

issue.  After [this], the court is free to accept or reject the findings in part or in whole." Id. at 792.  The First Circuit has characterized this standard as both "well short" of *de novo* review, Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993), and "something short" of *de novo* review, Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990).

Where the issue is one that implicates the educational expertise of the school district, more deference is due the administrative findings.  See Bd. of Educ v. Rowley, 458 U.S. 176, 206 (1982) (in reviewing adequacy of Individualized Education Program (IEP), framework of review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities"); Roland M., 910 F.2d at 989 (in reviewing adequacy of IEP, courts must give due weight to agency's decision because "[j]urists are not trained, practicing educators").

But when the issue is more a matter of law, the educational expertise of the agency is not implicated, and less deference is required.  Thus, where the issue was the proper construction of the statutory term "education," and the facts relating to the child's needs were undisputed, the First Circuit rejected the argument that the trial court gave insufficient deference to the agency: "[t]he construction of a statutory term traditionally falls within the scope of judicial review." Abrahamson v. Hershman, 701 F.2d 223, 231 (1st Cir. 1983).  Although a trial court should not "impose a particular educational methodology upon a state" under the guise of interpreting a statute, "for judicial review to have any meaning, beyond a mere review of state procedures, the courts must be free to construe [terms] so as to insure" compliance with the IDEA.  Id.; see also Irving Indep. Sch. Dist. v. Tatro,

10

468 U.S. 883, 890 n.6 (1984) (judicial review of legal questions is appropriate).

According to the First Circuit:

> In the end, the judicial function at the trial-court level is "one of involved oversight," and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale.

Lenn, 998 F.2d at 1087 (citation omitted).

### (C)  Definition of Terms: "Adversely Affects Educational Performance"

Federal regulations do not define the phrase "adversely affects . . . educational performance."  Instead, "each State [gives] substance to these terms."  J.D. ex rel. J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 66 (2d Cir. 2000); see also 20 U.S.C. § 1401(8) (free appropriate public education provided to students with disabilities must "meet the standards of the State educational agency"); Town of Burlington, 736 F.2d at 789 (holding that "the [IDEA] incorporates by reference state standards, be they substantive or procedural, that exceed the federal basic floor of meaningful, beneficial educational opportunity"); see generally Garda, supra, at 465-86.

### (1)  "Educational Performance"

Maine has chosen to define "educational performance" broadly.[3]   Under Maine's regulations, even the term "academic area" includes communication skills, i.e., skills that may be implicated by Asperger's Syndrome.  But in addition to academic areas, Maine explicitly includes "non-academic areas (daily life activities, mobility, etc.), extracurricular activities, [and] progress in meeting goals established for the general curriculum."  MSER § 2.7.

---

[3] "The term 'educational performance' includes academic areas (reading, math, communication, etc.), non-academic areas (daily life activities, mobility, etc.), extracurricular activities, progress in meeting goals established for the general curriculum, and performance on State-wide and local assessments." MSER § 2.7.

11

Maine's broad definition of educational performance "reflects and harmonizes with the recognition of both Congress and the Maine legislature that the purpose of education is not merely the acquisition of academic knowledge but also the cultivation of skills and behaviors needed to succeed generally in life."  Rec. Dec. at 29.  It is also consistent with First Circuit caselaw.  See Roland M., 910 F.2d at 992 ("purely academic progress—maximizing academic potential—is not the only indici[um]" relevant to IDEA claims).

This breadth is reflected most directly in several of the State-identified curriculum goals that can be implicated by Asperger's Syndrome.  See Maine Learning Results Regulations, 05 071 CMR 131-1 et seq. ("MLRR") (1997).[4]  For example, under "English Language Arts," middle school students are supposed to "[f]orm conclusions regarding formal, informal, and other varieties of language use, based upon experience," id. § 1(1)(C)(3)(a), and "[d]eliver oral presentations that use a variety of strategies of address (e.g., eye contact, hand gestures, voice changes modulation, changes of rhythm)."  Id. § 1(1)(G)(3)(j).  Verbal and nonverbal communication skills can be limited significantly by Asperger's Syndrome.

Under "Physical education," students are to "demonstrate responsible personal and social behaviors in physical activity settings," id. § 6(2)(B)(3), which

---

[4] The term "general curriculum" means the School District's K-12 curriculum "which incorporate[s] the content standards and performance indicators of the Learning Results." MSER § 2.11.  The "Learning Results" system is established by statute, and is based upon six guiding principles to establish high academic standards in eight content areas.  20-A M.R.S.A. § 6209 (West Supp. 2005).  As directed by statute, the Department of Education has published standards and performance indicators for the content areas, see MLRR § 1 et seq.  The guiding principles direct that "each student must leave school" as a (1) "clear and effective communicator[,]" (2) "self-directed and life-long learner[,]" (3) "creative and practical problem solver[,]" (4) "responsible and involved citizen[,]" (5) "collaborative and quality worker[,]" and (6) "integrative and informed thinker . . ."  20-A M.R.S.A. § 6209(1).  Asperger's Syndrome affects many of these guiding principles, but since the principles may be viewed as aspirational, I do not address them.  See Garda, supra, at 470.

includes demonstrating "appropriate etiquette, ways of interacting, care of equipment, and safety in the setting of an activity." Id. § 6(2)(B)(3)(c)(vi). "Health education" is also an important content area in the general curriculum. Students must "explain the relationship between healthy behaviors and the prevention of injury." Id. § 6(2)(A)(1)(c)(i). They "will understand how to reduce their health risks through the practice of healthy behaviors," id. § 6(2)(A)(3), including "demonstrat[ing] ways to avoid or change situations that threaten personal safety," and "distinguish[ing] between healthy and unhealthy stress management techniques." Id. § 6(2)(A)(3)9(c)(v)-(vi). In this content area they must also "[d]emonstrate effective verbal and non-verbal communication skills to enhance health and to build . . . healthy relationships." Id. § 6(2)(A)(5)(c)(i). Communication, social interactions, collaboration, all can be implicated by AS.

"Career preparation" is designed to "help[] students develop the ability to handle changes." Id. § 8(1). At middle school, a student should learn to "[d]etermine effective workplace behaviors and skills," and "[u]se teamwork strategies and apply communication and negotiation skills to decision making." Id. § 8(2)(A)(3)(a)-(b). Ability to accept change, communication and teamwork can all be affected by AS.

The Hearing Officer in this case recognized that Maine's definition of "educational performance" "encompasses more than just academic proficiency." Hr'g Dec., Rec. at 557. She also stated that the First Circuit has recognized "a broad definition" of the term and quoted First Circuit language that an Individualized Education Plan (IEP) "must target 'all of a child's special needs, whether they be academic, physical, emotional, or social.'" Id. at 557 (quoting Town

13

of Burlington, 736 F.2d at 788).  But then she limited the scope of Maine's definition and the First Circuit caselaw by stating that they all involved instances where "the non-academic needs negatively impacted the students' academic progress."   Id. According to the Hearing Officer:

> The question at the heart of this dispute . . . is not whether a school department is required to address all of a student's needs, including social and emotional, as well as academic, but whether a school department is required to address social and emotional needs when there are *no* academic needs.
>
> Student is obviously a troubled young woman. She has a depressive disorder as well as a disability that challenges her in social situations. She is receiving mental health services and will apparently need to continue those services for quite some time. She will probably always have some difficulties in social situations, but the social progress she has shown at the Community School bodes well for her continuing positive social development.
>
> However, neither the I.D.E.A. nor the Maine Special Education Regulations require a school district to provide special education services to address what is essentially a mental health issue. . . .

Id. at 558 (emphasis original).

I disagree with the Magistrate Judge that this was harmless error.[5]  Asperger's Syndrome is not "essentially a mental health issue" and Maine educational performance standards are directly concerned with social needs.  The Maine special education regulation nowhere limits that concern to academic impact.   As one academic commentator has observed more generally:

---

[5] In fact, school personnel and the Hearing Officer all found detrimental effects on L.I.  (According to the Hearing Officer, she was "obviously a troubled young woman" requiring mental health services "for quite some time" who "will probably always have some difficulties in social situations."  Hr'g Dec., Rec. at 558.)  She was denied eligibility, however, because the Hearing Officer and school personnel determined that in the absence of impact on her grades or test scores, these detrimental effects constituted only a short-lived "mental health crisis."   Since educational performance encompasses more than academics, and since I adopt the Hearing Officer's factual findings that detrimental effects were found prior to Grade 6 and that L.I. will have difficulties in social situations in the future, it is not correct to characterize her difficulties as only a short-lived crisis.

14

> [N]eed for special education can exist in any area of educational performance adversely affected by the disability, not just academics. . . . [For example,] attendance and behavior are educational performance that must be addressed despite good academic performance.  They are not merely means to the end of academic achievement, but are themselves educational ends.

Garda, supra, at 498-99.  Thus, L.I.'s academic successes and her nondisruptive classroom behavior should not have ended the Hearing Officer's inquiry.  The question is whether L.I.'s condition adversely affected her performance in any of the educational areas Maine has identified.[6]

My conclusion on this score derives from interpreting the statutory and regulatory language, not second-guessing educational decisions.  Thus, less deference is required.  Moreover, given the Hearing Officer's clear legal error, I do not strain to affirm her decision on a harmless error analysis.  Although I defer to the Hearing Officer's factual findings, I make my own factual findings on issues that she failed to resolve or address because of her error.

### (2)  "Adversely Affects"

Neither the federal statute and regulations nor the Maine statute and regulations define "adversely affects."  Ordinary usage suggests that any negative effect should be sufficient.  The phrase has no qualifier such as "substantial," "significant," or "marked," unlike language in other portions of the same regulation.

---

[6] The Recommended Decision recognized that educational performance encompasses more than merely academic performance.  Rec. Dec. at 29 (citing Roland M., 910 F.2d at 992).  It then went on to state that "[w]hile a child's impairment need not necessarily manifest itself in academic failure, . . . it must . . . manifest itself in an adverse effect on the child's ability to learn."  Rec. Dec. at 32 (citing Gonzalez v. P.R. Dep't of Educ., 254 F.3d 350, 352 (1st Cir. 2001) and Rome Sch. Comm. v. Mrs. B., 247 F.3d 29, 33 n.3 (1st Cir. 2001)).  This statement of the law is correct: "educational benefit" is the touchstone of the IDEA's substantive guarantee of a free appropriate public education, Rowley, 458 U.S. at 206, and it is measured by whether the child is afforded the "ability to learn." Rome Sch. Comm., 247 F.3d at 33 n.3.  But "ability to learn" is not restricted to academic areas.  See id. at 33 (evidence of child's disability-related behavior problems, including aggression, relevant).

See, e.g., 34 C.F.R. §300.7(c)(1) ("significantly affecting"); id. §300.7(c)(4) ("to a marked degree"); id. § 300.7(c)(6) ("significantly subaverage").  At least one academic commentator has agreed, and has also suggested that "[d]ecision-makers adding a qualifier to adverse effect are engaging in inappropriate judicial lawmaking. . ." Garda, supra, at 485 (citing, inter alia, Cedar Rapids Cmty. Sch. Dist. v. Garret F. ex rel. Charlene F., 526 U.S. 66, 77 (1999)).  As Maine's definitions are similarly unmodified, see MSER §§ 3.2, 3.5, 3.10, I interpret the phrase as reflecting Congress's and Maine's intent that any adverse effect on educational performance, however slight, meets this prong of the definition.

Characterizing L.I.'s difficulties as merely a "mental health crisis," the School District argues that any adverse effect was too short for her to be IDEA-eligible, citing Vermont, Maine, and federal regulations.  Def.'s Reply to Pls.' Objection at 11-12.  Vermont special education regulations define "adverse effect" explicitly, stating that it requires diminished performance on certain empirical measures, "generally over a six month period of time." Vt. Special Educ. Reg. § 2362(c)(2).  Unlike Vermont, the Maine Department of Education has declined to require a certain period of time.   I draw no inference of a required minimum period from Maine's regulatory silence.

The School District also cites a Maine special education regulation concerning a school district's "child find" obligations.  Def.'s Reply to Pls.' Objection at 12.  In the *absence* of a referral by parents or others, a school district must identify (i.e., "find"), evaluate, and refer "at risk students," who "may include [students with] 45 absences during a school year."   See MSER § 7.7(D).  That 45 days does not mark the outer limit of eligibility, but merely sets a standard for identifying pupils whose

parents have not referred them.  Without a referral, it is sound to set an easily ascertainable measure that will trigger a school district's "child find" obligations as a recipient of federal funds.  But the standard does not apply to students who have been referred.

Finally, the School District also points to the "serious emotional disturbance" definition.  This category requires "a condition exhibiting one or more [enumerated] characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance."  34 C.F.R. § 300.7(c)(4)(i); see also MSER § 3.5 (same).  The School District interprets this regulation to mean that the adverse educational effect must itself occur over a long period of time.  Def.'s Reply to Pls.' Objection at 12.  Putting aside the fact that there is no similar requirement for L.I.'s Asperger's Syndrome, I conclude that the School District reads the serious emotional disturbance regulation incorrectly.  A grammatical reading of the regulation shows that the antecedent of "adversely affects" must be the singular noun "a condition," because "affects" is the singular verb form.  Therefore, it follows that the "condition" that a child must possess has two *independent* requirements: (1) that it must exhibit certain characteristics over a long period of time and to a marked degree, and (2) that it must adversely affect educational performance.  The regulation does *not* require that the condition affect educational performance over a long period of time.[7]  This reading of the regulation makes sense: it requires that a

---

[7] The other disability definitions in this section are structured grammatically in a similar fashion. For example, the "autism" definition requires a "developmental disability significantly affecting verbal and nonverbal communication and social interaction . . . that adversely affects a child's educational performance."  34 C.F.R. § 300.7(c)(1)(i).  It would be arbitrary to read the emotional disturbance definition differently from the others, in  determining the meaning of the phrase "adversely affects a child's educational performance."

school offer services to a child as soon as the adverse effect on educational performance manifests itself, not wait a "long period of time," thereby risking complete failure, nonpromotion, or other educationally damaging results.

### (3) *Application of the Terms to L.I.*

The mere fact of a diagnosis of Asperger's Syndrome and Adjustment Disorder with Depressed Mood does not automatically qualify a child for special education under IDEA; the disability must adversely affect the child's educational performance.   I conclude that on this record L.I.'s Asperger's Syndrome is a condition that does indeed adversely affect her educational performance.

There is no doubt that L.I. is very bright: in kindergarten through third grade she "did well in school and excelled academically"; in fourth grade her "grades were strong"; even when her grades dropped in fifth grade they went from "high honors" to "honors."  Rec. Dec. at 2-3, 5.  As the Magistrate Judge found, for the most part her behavior in the classroom has been nondisruptive toward other children and teachers: "the Record evidence by and large paints a picture of a child who . . . obeyed rules even when she did not agree with them, [and] was not rude or otherwise a school disciplinary problem . . ." Id. at 31-32; see also Hr'g Dec., Rec. at 558 (L.I. "is well behaved in class . . .").  Despite L.I.'s undisputed intellectual ability and generally nondisruptive behavior, however, the administrative record and supplemental evidence show a young girl whose educational performance has been adversely affected by AS, a condition that became apparent as L.I. matured.  The problems she experienced at school as a result of Asperger's Syndrome occurred in areas that Maine considers "educational performance," including academic areas, non-academic areas, and progress toward Maine's general curriculum standards.

18

I start with the explicit findings of the Hearing Officer:

> Student is obviously a troubled young woman. She has a depressive disorder as well as a disability that challenges her in social situations. She is receiving mental health services and will apparently need to continue those services for quite some time. She will probably always have some difficulties in social situations . . .

Hr'g Dec., Rec. at 558.   Many of L.I.'s school professionals reported that L.I. was withdrawn from, and unable to connect with, her peers.   Her fifth grade teacher "noticed that L.I. seemed to be exhibiting signs of depression and sat at a distance from her peers whenever possible," and noted that "the health teacher and school counselor also commented about L.I.'s emotional as well as physical distance from the others."   Rec. Dec. at 3-4 (quotations and citations removed).   Her sixth grade teacher testified that: L.I. "tended to create a distance between herself and the other students," except for several younger, "underdog" and "misfit" students.   Due Process Hr'g Tr., Slegona Test., Rec. at 672, 674.   This teacher also testified that she "didn't feel like [she] was reaching [L.I.] the way [she] was other kids," id., and that overall she was not able to engage L.I.   Id.   She further testified, about L.I.'s non-connection with both students and herself, that:

> [I]n not getting the feedback that I was expecting from [her], I was never sure how she was responding to what I was saying, of what my role had to be in the classroom, of what the needs of or the feelings of other classmates were. I couldn't get a read on that.

Id. at 676.   This testimony echoed the teacher's concerns in a much earlier evaluation, where she stated: "[L.I.] continually displays a serious lack of awareness of the social and emotional 'state' of her peers and perhaps adults." Teacher Questionnaire, Rec. at 200.   The school counselor testified:   "I think it was

challenging for [L.I.] to explain her emotions with another person." Due Process Hr'g Tr., Benoit Test., Rec. at 685. This evidence is telling, given Maine's concern with teamwork, MLRR § 8, and "communication," both verbal and nonverbal, MSER § 2.7, as part of "educational performance." Even if L.I. has excellent writing skills (to which several teachers attest), nonverbal communication is an important skill to be learned in Maine's curriculum.[8]

Some of these educators' observations were brought up and discussed at the PET meeting. Mar. 3 Meeting Minutes ("Mar. 3 Mins."), Rec. at 338 (teacher stating that "she was aware of a distancing," that L.I. "didn't engage," and that she "would disappear into the bathroom" during Math). The findings were not disputed, objected to, or called into question: instead, the only reason the PET did not find L.I. IDEA-eligible was because of its unfounded belief that academic performance had to be affected. See, e.g., id. at 340 (School District's Director of Special Services stating "his argument was that [L.I.]'s achievement scores and academics were fine"); id. at 339-40 ("it is unusual to have a PET talking about scores at this level . . . [L.I.] has passed grade to grade successfully").

The Hearing Officer agreed with the academic performance focus, characterizing L.I.'s condition as merely "a mental health issue" that the school district was not required to address, Hr'g Dec., Rec. at 558, and assessing "adverse

---

[8] There is also the fact of L.I.'s self-mutilation (carving into her own arms), Rec. Dec. at 7, during long breaks from math class in sixth grade, surely demonstrating a failure to understand the relationship between healthy behaviors and injury prevention, how to reduce health risks through the practice of healthy behaviors, how to avoid or change situations that threaten personal safety, or distinguish between healthy and unhealthy stress management techniques or how to learn responsible personal and social behaviors. These are all skills that Maine requires students to acquire and demonstrate in school. Further, a student who spends time alone in the bathroom hurting herself during school hours, with a sympathetic teacher mere steps away, has not learned how to use communication skills to enhance her health, also part of Maine's general curriculum.

effect" only in terms of academic performance.  However, Maine's broad definition of "educational performance" is to the contrary: many of L.I.'s social and communication deficits, including her isolation, inflexibility, and self-mutilation during schooltime, are precisely in the content areas and skills that Maine mandates educationally.  Asperger's Syndrome is a lifelong condition; it is not temporary, and it is incurable by medication.  DSM-IV, supra, § 299.80.  L.I.'s depression developed in response to the social and communication problems associated with Asperger's Syndrome, Neuropsychological Evaluation ("Neuropsych. Eval.").  Rec. at 82.

In addition, L.I.'s sixth grade teacher commented several times on L.I.'s inflexibility.  First in an evaluation letter she stated that L.I.'s "sense of fairness and appropriateness are evidently distorted.  She seems to want the world her way only." Teacher Questionnaire, Rec. at 200.  Later she testified at the hearing:

> She had strong opinions on things, but I was concerned about her being able to see the other side, somebody else's side . . . [She has a] real strong sense of justice and fairness from her perspective, and it was her perspective and it didn't seem that other perspectives, other input, made much of a difference.

Due Process Hr'g Tr., Slegona Test., Rec. at 676.  This description implicates the ability to handle changes, effective workplace behaviors or skills, or use teamwork strategies, all requirements of the career preparation component of the Maine general curriculum.

In L.I.'s neuropsychological evaluation, Dr. Popenoe found specific social deficits:

> She has significant difficulty reading social cues and has limited friends . . .

21

. . . .

> . . . [She] has poor pragmatic language skills that appear to be adversely affecting her social relationships, especially with peers.  While she desires peer interactions, she misreads social cues and has difficulty understanding social rules to initiate and maintain interpersonal interactions.   She also has difficulty taking the perspective of others.

Neuropsych. Eval., Rec. at 81.   Although the Hearing Officer attributed L.I.'s difficulties to a short-term mental health crisis rather than a permanent disability, Dr. Popenoe identified the permanent AS condition as responsible: L.I.'s depression resulted from "the severe stress she was under socially and her feelings of loss over not being accepted and having close friends.  This is common in adolescents with Aspergers."  Id. at 82.  Dr. Popenoe concluded that L.I.'s "adaptive behavior is below average and an area of significant weakness.  Thus, while she is very bright, her ability to navigate in real life settings is more limited."   Id. at 81.  Dr. Popenoe testified at the hearing that L.I.'s "adaptive functioning is in the borderline range which is close to what you would see in mental retardation."  Due Process Hr'g Tr., Popenoe Test., Rec. at 692.  She also noted weaknesses in "skills needed to protect her health and respond to illness and injury." Neuropsych. Eval., Rec. at 77.  These are not consequences flowing from a short-term mental health crisis, but from L.I.'s underlying, permanent condition of AS.   The speech-language evaluation noted consistent results. L.I. "show[ed] deficits in her ability to tolerate conversations and people that are outside her areas of interest."   Communication Evaluation ("Communication Eval."), Rec. at 69. L.I. "does present with significant social understanding deficits which impact her overall emotional and social well being." Id.

I conclude that in light of the school professionals' and experts undisputed conclusions, the parents have shown an adverse effect on L.I.'s educational performance.   I do not intrude upon the educational expertise of the school personnel in reaching this conclusion, for the school personnel (and the Hearing Officer) used an unfounded legal standard when making their own determinations of no adverse educational effect.   Indeed, the teachers and counselor found social isolation, poor communication, self-injurious behavior during class time, and failure to adapt or accept others' world views.   All these failings demonstrate an adverse effect on L.I.'s educational performance, as measured by academic areas, non-academic areas, and the goals outlined in Maine's broad general curriculum standards.   In turn, the two experts found empirical evidence of these deficits, and attributed them to L.I.'s diagnosis of Asperger's Syndrome and Adjustment Disorder with Depressed Mood.

The Hearing Officer refused to find adverse effect because of L.I.'s academic success and her nondisruptive behavior:

> The student . . . completes homework independently, is well behaved in class, is successful at test taking and successfully completes projects.   The question at the heart of this dispute, therefore, is not whether a school department is required to address all of a student's needs, including social and emotional, as well as academic, but whether a school department is required to address social and emotional needs when there are *no* academic needs.

Hr'g Decision, Rec. at 558 (emphasis original).   Under the Maine statute and regulations, the definition of educational performance encompasses more than

homework completion, testing, nondisruptive behavior[9] and project completion.  I conclude that L.I.'s AS has adversely affected her educational performance as Maine defines the terms.[10]

**(D)  Definition of Terms: "By Reason Thereof, Needs Special Education and Related Services"**

The experts who examined L.I. after her suicide attempt made a number of recommendations for interventions that they believed would be helpful to L.I.  The neuropsychologist recommended speech and language evaluation and therapy (including both individual and small group components), direct social skills teaching, constant supervision at school and protection from teasing, a social skills coach, alternative punishment strategies, cognitive behavioral counseling, transitional assistance, and typing all written work.  Neuropsych. Eval., Rec. at 82-83.  The speech-language expert recommended familiarizing L.I.'s therapist with Asperger's Syndrome, certain computer software to teach nonverbal emotions directly, specific teaching about deciphering fact from fiction, and alternative punishment strategies (perhaps including a "safe person" at school). Communication Eval., Rec. at 69-70.

---

[9] As *amici* point out, "[s]ome disabilities (e.g., depression, A.D.D.) may manifest internalized symptoms," rather than externalized or "acting out" symptoms such as "disrupti[on] to the educational process e.g., breaking school rules, preventing other students from learning."  Amici Curiae Br. of Disability Rights Ctr. & Autism Soc'y of Me. ("DRC & Autism Soc'y Brief") at 4-5 (Docket Item 46).  Students with internalized symptoms who fail to disturb a classroom are not thereby disqualified from IDEA eligibility.

[10] L.I.'s improvement at the Community School after her suicide attempt does not undercut this conclusion.  The Community School is an environment where other students respect differences, discourage teasing, and cliques are not as common.  Due Process Hr'g Tr., Thelemarck Test., Rec. at 588.  These characteristics help alleviate some of the educational pressures that L.I.'s disabilities make difficult to navigate, but these characteristics of the Community School are unique, not mainstream, and not reflective of L.I.'s time at public school, or her eventual integration into the wider world after graduation.  Additionally, the parents have presented evidence that L.I. still has the same difficulties relating to others outside her interest in Japanese anime, and has developed new behaviors tied to her inflexibility and inability to accept change (travel and food restrictions).  Rec. Dec. at 19-20.

The PET used both these experts' reports, did not dispute them in the PET meetings, and adopted virtually all their suggestions.  In the first PET meeting, the team reached consensus that L.I. needed "social-skills and pragmatic-language instruction, and access to a program that recognized her cognitive strengths" (although the team did not reach consensus on her IDEA eligibility).  Rec. Dec. at 16.  In the second "Section 504" meeting, the team developed a plan that "included close supervision, speech/language therapy services to address social-pragmatic instruction, access to social-work services and access to Gifted and Talented" classes.  Rec. Dec. at 16-17.  The team also decided that L.I. could be tutored at home by a teaching professional for three hours a day, in order to make a gradual transition back to public school from the Community School.  Id. at 17.

In light of the PET's agreement to provide these services, the reader may wonder why there is a dispute on this issue of "need for special education and related services."  In fact, the School District failed to provide its first promised accommodation (a tutor at home while L.I. recovered from her suicide attempt) and after several ignored requests, L.I.'s parents eventually decided to enroll L.I. in a private school.  The parents therefore rejected the School District's later offer of § 504 services in connection with resuming public school attendance.  Instead, the parents seek tuition reimbursement, special education services while L.I. attends the private school and an IEP that meets L.I.'s unique needs, including a plan for a gradual transition back to public school.  The School District now disagrees that L.I. requires *any* special education services and characterizes its earlier agreed-to-offerings as merely "accommodations" under §504 of the Rehabilitation Act, 29 U.S.C. § 794, not special education services required under the IDEA.  The School

District also argues that L.I.'s parents had decided earlier to send L.I. to the Community School, the school her older sister attended, and should not be permitted to make the School District pay for that decision or provide services while L.I. attends the Community School.  The School District therefore resists all the claims for relief.

This prong of the eligibility criteria contains two separate elements, which I discuss separately.

### (1) *"Special education and related services"*

At the federal level, "special education" is defined as "specially designed instruction . . . to meet the unique needs of a child with a disability."  20 U.S.C. § 1401(25).  Regulations specify that it requires adapting for each child, as appropriate, "the content, methodology, or delivery of instruction," to address the child's "unique needs", and to "ensure [her] access . . . to the general curriculum," so that she can "meet the educational standards within the [school district] that apply to all children."  34 C.F.R. §300.26(b)(3).  The term "related services" is defined as well in the implementing regulations: "transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education."  34 C.F.R. § 300.24(a).  The regulation further lists the included services: those possibly implicated here are "speech-language pathology," "psychological services," "counseling services,"

"medical services for diagnostic or evaluation purposes," "school health services," "social work services," and "parent counseling and training." Id.[11]

Maine law defines "special education" more inclusively: it means "classroom, home, hospital, institutional or other instruction; educational diagnosis and evaluation; transportation and other supportive assistance, services, activities or programs" required by students with disabilities. 20-A M.R.S.A. § 7001(5) (West 1993). The definition of "supportive services" is identical to that of the federal definition of "related services." MSER § 2.28 ("'Supportive Services' is synonymous with the term 'Related Services').

Many of the changes the experts recommend for L.I.'s educational experience (agreed to in large part by the School District) rise to the level of "specially designed instruction . . . to meet the unique needs of a child with a disability" as defined by the IDEA, and also rise to the level of "instruction," "diagnosis and evaluation," and "other supportive assistance, services, activities or programs" under Maine's broader definition. For example, the offered one-on-one tutoring is adapting the "methodology" and "delivery of instruction" to meet L.I.'s "unique needs." The extra instructional offerings such as social-skills and pragmatic-language instruction are also "specially designed instruction" to ensure L.I.'s "access . . . to the general curriculum." The constant close supervision agreed to by the PET is yet another example of adapting the "delivery of instruction," as contemplated by the IDEA. Dr. Popenoe wrote that L.I. "should be supported in using her areas of interest as a

---

[11] Of "related services," the Supreme Court has said: "[a] service that enables a handicapped child to remain at school during the day is an important means of providing the child with the meaningful access to education that Congress envisioned." Tatro, 468 U.S. at 891. However, if a child is determined to have an enumerated condition, "but only needs a related service and not special education," the child is not eligible under the IDEA. 34 C.F.R. § 300.7(2)(i).

topic wherever possible in her schoolwork," and "[w]ith her organizational difficulties, [L.I.] will benefit from being allowed to type written work," and "[i]f she returns to school, [L.I.] should be well supervised at all times, especially recess, and should be protected from harassment and abuse from peers . . . [She is] at high risk for being victimized . . . [and thus] it is recommended that she be provided with a social skills coach."   Neuropsych. Eval., Rec. at 82-83.   The speech-language pathologist Lambke also recommended intervention regarding rules and punishment:

> [L.I.] will benefit from continued explanation as to the reasoning behind rules . . . [W]hen she is feeling confined by a particular rule or situation, [she] will need to learn how to negotiate compromises in a conflict resolution. In a school environment, this can requires that she have a "safe person" who is familiar with her level of social understanding and needs and can listen to her and help facilitate the problem solving, compromise, and conflict resolution.

Communication Eval., Rec. at 70.[12]   All of these meet the federal and state definitions of special education and related services.   At the PET meetings, the School District never disputed these findings, and indeed adopted many of them in the services it offered L.I. under § 504.   See H'rg Dec., Rec. at 558.

---

[12] The recommendation was consistent with Dr. Popenoe's views:

> Punishment is not likely to be effective for [L.I.] because once she starts to lose control, she has little capacity to use previous experience to think about consequences for her behavior.  Instead the focus should be on preventing outbursts [and  other alternative techniques].  Once she does become explosive, she loses the capacity to learn from that situation and so can best learn coping skills by avoiding these emotional states as much as possible.

Neuropsych. Eval., Rec. at 83.

### (2) "Need" for Special Education and Services

The remaining question is whether L.I. "needs" these services as a result of her disability, as both the federal and state regulations require, or whether they are just accommodations under § 504 as the School District contends.

Neither the federal statute and regulations nor the Maine statute and regulations define the term "need."   The caselaw is exceedingly murky on what the term means.[13]  See Garda, supra, at 491-512.  Moreover, the factual record on need is poorly developed here, for a reason.  Although there was disagreement over whether L.I. was IDEA-qualified, the PET meetings proceeded on the basis that everyone agreed that L.I. "needed" and should be afforded what the experts recommended for her.[14]  In preparation for the hearing, the School District did not raise the issue of "need" for services in its Prior Written Notice that explained the reason for the IDEA eligibility denial.  Prior Written Notice, Rec. at 53 (only reason for denial was "no significant adverse effect on education").   Nor did the School

---

[13] In a case such as this, where eligibility has been denied and the child has never received special education services, the law is even murkier.  That is so because almost every case to consider "need" concerns a child who has already been determined eligible, and the parents are claiming that the IEP is inadequate because the services it prescribes do not meet her special education needs.  See, e.g., Gonzalez, 254 F.3d at 352 (issue was whether problems occurring at home can become educational needs if they affect the student's ability to learn, and thus whether such needs must be addressed in the already eligible child's IEP in some fashion); Rome Sch. Comm., 247 F.3d at 33 (issue was "extent of [the already eligible child's] needs for behavior management services," and whether such services must be provided to child in IEP to address behavior spilling over into school).  While I can glean some guidance as to "need" from these cases, the fact that those children were already receiving services as eligible special education students makes the analysis somewhat different.  Further, even in cases where eligibility is the predicate issue, courts do not engage in extended analysis of the differences between an ordinary understanding of "need," as used by many parents or experts, and the statutory meaning assigned by the IDEA.  See, e.g., Yankton Sch. Dist. v. Schramm, 93 F.3d 1369, 1374 (8th Cir. 1996) (holding that child who received services that school deemed "504 accommodations" was IDEA-eligible because services rose to the level of "specially designed instruction," without analysis of "need"); but see Garda, supra, at 499-501 (stating that courts must consider whether child prospers with services offered pursuant to § 504; if so, IDEA-eligibility should not be found).

[14] Dr. Popenoe opened her Recommendations section with the phrase: "[L.I.] has significant needs if she is to return to school."  Neuropsych. Eval., R. at 82.

District refer to the issue in its pre-hearing legal memorandum to the Hearing Officer and the parents.  See Def.'s Prehearing Mem., Rec. at 28-30.  The issue of "need" first emerged in only two sentences of the School District lawyer's opening statement before the Hearing Officer, Due Process Hr'g Tr., Def.'s Opening Statement, Rec. at 573, and then in later testimony the School District elicited at the hearing, see, e.g., Due Process Hr'g Tr., McDevitt Test., Rec. at 640.  The School District pursued the issue in a Post-Hearing Memorandum, see Def.'s Post-Hearing Mem., Rec. at 526-30.  But the parents did not present either evidence or argument on the issue, and now contend that the School District waived the issue by failing to raise it earlier.  See Pls.' Objection to Rec. Dec. at 7 n.3 (Docket Item 43).  Ultimately, the Hearing Officer made no findings about need arising from L.I.'s condition.[15]

The available choices at this point, then, are to reach a conclusion on a poorly developed factual record with no administrative finding and little legal guidance; remand to the Hearing Officer with instructions to gather new evidence and make a finding, retrospectively, as to what L.I.'s needs were in 2003, an artificial undertaking in the eyes of anyone but judges and lawyers; or proceed as the parties proceeded before the School District first raised the potential issue during the hearing, i.e., on the assumption that "need" was not a contested issue.  Whether or not "waiver" is the correct term, I conclude that the PET, the experts, the School District and the parents all initially believed that L.I. "needed" the identified services.  The School District's lawyer may have belatedly recognized and raised at

---

[15] The Hearing Officer did find that L.I. needs services, but she attributed the need to L.I.'s mental health crisis, not her underlying Aspergers condition.  Hr'g Dec., R. at 558.

the hearing the issue that the statutory definition of "need" might differ from the usage the parties had employed, but that realization was too late without explicit notice to the parents and an invitation to respond.   The School District should at least have requested a ruling from the Hearing Officer that "need" was a live issue, thereby alerting the parents that they must present testimony and argument. Without a developed record or a Hearing Officer ruling on "need," I hold the parties to their original understandings and their pre-hearing framing of the issues.   "Need" is not a contested issue.

As a result, I conclude that L.I. has made her case that she is eligible under the IDEA.

**(E)  The Remedy**

The IDEA allows a court to "grant such relief as the court determines is appropriate."   20 U.S.C. § 1415(i)(2)(B)(iii).   L.I.'s parents request two specific forms of relief for the IDEA violation: first, reimbursement of the costs associated with educating L.I. at the Community School; and second, compensatory educational services.   Pls.' Mem. at 50.   The School District argues that if I conclude that L.I. is eligible for IDEA special education services, the appropriate remedy is ordering "the PET to reconvene to develop an appropriate [Individualized Education Program]." Def.'s Mem. at 42.

**(1)  Convening the PET**

I conclude that the School District's suggested remedy is the very least that is required.   The law is clear that once a child is identified as IDEA-eligible, the school district is *required* to create an IEP.   34 C.F.R. § 300.343; MSER § 10.1.   Therefore, I order the School District to convene a PET meeting in accordance with State and

31

Federal law to develop an IEP for L.I. that meets her unique needs as a student with Asperger's Syndrome and a depressive disorder.

### (2)  Reimbursement

The parents have also requested reimbursement of their tuition expenses for enrolling L.I. in the Community School.  The remedy of parental reimbursement for the cost of unilaterally placing a child with a disability in a private school is subject to important limitations.  Reimbursement may be denied if the parent failed to give adequate notice to the school district before the unilateral placement.  20 U.S.C. § 1412(a)(10)(C)(iii)(I); MSER § 12.11(S); Greenland Sch. Dist., 358 F.3d at 160.  It may also be denied if the private placement itself is not appropriate for the child.  34 C.F.R. § 300.403(c); MSER § 12.11(S); Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993).  Finally, it is available only if the school district has failed to provide the child with a free appropriate public education.  20 U.S.C. § 1412(a)(10)(C)(ii); MSER § 12.11(S).

Although reimbursement does not fail here for inadequate notice, I conclude that the parents have not met their burden of demonstrating the appropriateness of the Community School as a private placement.  Therefore, I deny the parents the remedy of reimbursement, and do not reach the issue of whether the School District provided a free appropriate public education.

### (a)  The Notice Requirement

The relevant statutes and regulations state that reimbursement may be denied if the parents failed to give adequate notice to the school district before unilaterally placing their child in a private school.  20 U.S.C. § 1412(a)(10)(C)(iii); MSER § 12.11(S); see also Greenland Sch. Dist., 358 F.3d at 160.  Notice consists of

informing the school of (a) the parents' disagreement with the school district's decision, (b) the intention of the parents to enroll the child in a private school, and (c) the intention to seek reimbursement.   MSER § 12.11(S); see also 34 C.F.R. § 300.403(d)(1)(i).

The School District's primary argument is that L.I. was "removed" from public school in October, 2003, and that the parents' notice came after that date.   They rely on the federal reimbursement regulation, which requires that notice must be given either (a) at the most recent IEP meeting prior *to removal* of the child from the public school, or (b) in writing at least ten days prior *to the same removal date*. 34 C.F.R. § 300.403(d)(1)(i)-(ii).   Maine regulations provide a different test: the same forms of notice must be given, but instead of removal from the public school, *enrollment in the private school* is the critical event.   MSER § 12.11(S).   Because "a state is free to exceed, both substantively and procedurally, the protection and services" provided by "a federal minimum floor," Burlington, 736 F.2d at 792, I conclude that Maine, in this instance, has a reimbursement policy that is more protective of parents than the federal policy.[16]   Thus, the parents are correct in arguing that L.I.'s enrollment at the Community School is the critical date for notice.

The record establishes that the School District received the requisite written notice before the parents enrolled L.I. at the Community School.   On January 5, 2004, Mrs. I sent a letter to the School District's Director of Special Services noting

---

[16] In a case such as this, where a child is in effect "removed" from school by a suicide attempt (or any other hospitalization, for that matter), pegging that date as "the removal date" would mean that L.I. could never qualify for reimbursement.   That cannot be the proper analysis.   Thus, the "removal" date must occur later, when the parents decide not to return her to public school.

the failure of the district to provide the promised tutor, and stating that L.I. would be "beginning private school this month."  Jan. 5 Mrs. I. Letter to McDevitt, Rec. at 351.   On January 28, 2004, Mrs. I. sent another letter,  again stating that the parents planned to enroll L.I. in a private school, and also referencing the 10-day notice requirement.  Jan. 28 Mrs. I. Letter to McDevitt, Rec. at 62.  In this letter she also noted that the two "[had] been talking about the possibility of the district helping to pay for an alternative program."  Id.  Thus, by January 28, 2004, the School District had received written notice that the parents disagreed with the School District's failure to  provide a tutor as had been promised, notice that the parents were intending to enroll L.I. at a private school, and notice that they would seek reimbursement.  As the only evidence bearing on the date of L.I.'s enrollment establishes that she still had not been "officially accepted" at the Community School by the end of February, 2004,[17] Feb. 27 Benoit E-mail, Rec. at 271, I conclude that the parents provided written notice at least 10 days prior to the enrollment of L.I. at the Community School, in accordance with Maine's  reimbursement requirements. The School District's argument rests upon the premise that the removal date, and not the enrollment date, is the critical event, see Def.'s Mem. at 46; therefore, the only evidence showing L.I.'s enrollment date is that presented by the parents, and it shows that she was not enrolled at the end of February.

### (b) The Appropriateness of the Private School Placement

When parents independently place their child in a private school, as L.I.'s parents did here, they may receive reimbursement "*only* if a federal court concludes

---

[17] Prior to that time she had attended a single class once a week in January, 2004, and then four days of classes a week during the month of February.

both that the public placement violated IDEA and that the private school placement was proper under the Act." <u>Florence County Sch. Dist. Four</u>, 510 U.S. at 15; <u>accord</u> <u>Rafferty v. Cranston Pub. Sch. Comm.</u>, 315 F.3d 21, 26 (1st Cir. 2002). Moreover, "parents who unilaterally change their child's placement . . . without the consent of state or local school officials, do so at their own financial risk." <u>Sch. Comm. of</u> <u>Burlington v. Dep't of Educ.</u>, 471 U.S. 359, 373-74 (1985). Although I have concluded that the School District erroneously found L.I. ineligible for IDEA benefits, the parents must also show that the Community School was a proper placement. Following <u>Schaffer</u>, ___ U.S. ___, 126 S. Ct. at 535 ("burden of persuasion lies [with] the party seeking relief"), I conclude that the parents have the burden of proof on this issue, <u>see</u> <u>also</u> <u>M.S. *ex rel.* S.S. v. Bd. of Educ.</u>, 231 F.3d 96, 104 (2d Cir. 2000), and they have failed to meet it.

To qualify, a private school need not necessarily meet state educational standards or be state-approved. <u>Florence County Sch. Dist. Four</u>, 510 U.S. at 14-15. But a parent is not free just to "seek any alternative school she wishes if the public school education is inadequate." <u>Rafferty</u>, 315 F.3d at 27. Instead, the private school education must be "reasonably calculated to enable the child to receive educational benefits." <u>Florence County Sch. Dist Four</u>, 510 U.S. at 11 (citation omitted). "Even if the child makes academic progress at the private school, 'that fact does not establish that such a placement comprises the requisite adequate and appropriate education.'" <u>Rafferty</u>, 315 F.3d at 26-27 (quoting <u>Rome Sch.</u> <u>Comm.</u>, 247 F.3d at 33).

Because the Hearing Officer found no IDEA violation, she did not consider the matter of remedy. Thus I do not have the benefit of her findings or conclusions on

the appropriateness of the Community School.   She stated merely that the Community School "is not an approved special education placement.  It is a small school, with an 8:1 student-teacher ratio.  The school currently enrolls one publicly placed student with Asperger's Syndrome and had previously enrolled other students with various disabilities."  Hr'g Dec., Rec. at 556.

But the Record does contain evidence concerning the basis for the parents' decision to place L.I. at the Community School.  The school was not recommended by any of the experts who examined or treated L.I.  Dr. Popenoe's recommendations were general, and applicable to any educational environment for L.I.: "[L.I.] has significant needs if she is to return to school."   Neuropsych. Eval., Rec. at 82. Lambke's comments were similarly general.  See, e.g., Communication Eval., Rec. at 70 ("[i]n a school environment . . .").   L.I.'s counselor believed strongly that L.I. should return to school, but studiously avoided an opinion as to whether it should be public or private.  Due Process Hr'g Tr., Northrup Test., Rec. at 577 ("I don't tell families what school they should go to or which one is better . . . I don't feel that's my area of expertise").   Thus, it was not the experts who suggested a placement at the Community School.

Instead, the Record suggests that the parents chose the Community School primarily because their other daughter had already started attending the school, the family was familiar with it, and Mrs. I.'s effort at homeschooling L.I. was unsuccessful.  See Oct. 11 Mrs. I. E-mail to McDevitt, Rec. at 362 ("[t]he school where her older sister goes might be appropriate").  This inference is borne out by Mrs. I.'s testimony at the hearing:

> I told [L.I.] I'm going to go stark-raving mad if we continue this.
> It's not working.  So [L.I.] said: All right.  All right.  I'll go to
> Community School, which, I mean, it was one of all the balls that
> was in the air.  I didn't know which one she was going to choose,
> but that's the one she chose.  I kind of knew she wanted to go to
> Community School, but she didn't want to go to Community
> School because she didn't want to go anywhere, but that was the
> one place where she thought maybe  she'd feel like she could be
> tolerated—no, accepted.

Due Process Hr'g Tr., Mrs. I. Test., Rec. at 615.  The parents apparently knew of at least one other school as a potential private placement for L.I.  See Rec. Dec. at 10 ("McDevitt . . . shared information about possible alternative placements, such as the Aucocisco School").  They did not seriously consider public school for L.I., at least not initially.  See Oct. 11 Mrs. I. E-mail to McDevitt, Rec. at 362 ("There's no way my daughter is coming back to MSAD #55 for the time being, because she has suffered too much emotional pain with her classmates.").  Months later, when the School District offered the parents their choice of public schools within the district, the parents rejected Cornish Elementary again because L.I. "has an absolute horror" of it.  Mar. 8 Meeting Minutes ("Mar. 8 Mins."), Rec. at 303.  They also rejected the only other public school discussed seriously, Hiram Elementary, because L.I. would dislike attending it.  Mar. 8 Meeting Mins., Rec. at 312 (Mrs. I. stating that L.I. would "say no way" to Hiram Elementary "because she used to go there . . . . She doesn't want to be in a position where she's a new kid and not a new kid"); id. at 319 (Mrs. I stating "I'd have to trick her.  I'd have to lie to her," in order to force L.I. to attend Hiram Elementary).  In fact, the Community School does not offer L.I. any of the special education services recommended by the experts or the PET.

The School District relies on these facts, and on Berger v. Medina City Sch. Dist., 348 F.3d 513, 523 (6th Cir. 2003), to argue that L.I.'s parents have not shown

that the Community School was an appropriate private placement under the circumstances.  In Berger, the hearing-impaired student argued that the school was appropriate in part because it was inherently smaller, quieter, and the teachers more attentive, thus enabling him to prosper.  Id. at 522.  However, the court ultimately found the placement inappropriate because it did not provide any of the special education services needed by the child: the school must "at a minimum, provide some element of special education services in which the public school placement was deficient."  Id.  L.I.'s placement at the Community School is directly analogous to the placement in Berger: the Community School similarly does not provide any expert-recommended special education services.

I conclude that the parents have failed to demonstrate that their decision to withdraw L.I. from the public schools and place her at the Community School was a placement decision "reasonably calculated to enable the child to receive educational benefits."  Florence County Sch. Dist. Four, 510 U.S. at 11, quoted in Rafferty, 315 F.3d at 27.[18]

### (c) Failure to Provide a Free Appropriate Public Education

Ultimately, therefore, I conclude that the parents do not fail on the notice requirement, but that they do fail to meet their burden regarding the appropriateness of the Community School.  I therefore deny the parents reimbursement for their private unilateral placement of L.I. at the Community School.  I do not reach the issue whether L.I. was denied a free appropriate public education.

---

[18] Although I deny the reimbursement claim, happily the Community School appears to have been good for L.I.  The parents have served their daughter well.

**(3)  *Compensatory Education***

The parents also request compensatory education for L.I., both "reimbursement for the costs of the [Community School] placement[,] to the extent that placement has served to compensate LI for the District's violation of her rights," and "traditional prospective compensatory services, to make up for the District's failure to identify LI as eligible in a timely fashion and provide her with appropriate services."  Pls.' Reply Mem. at 15 (Docket Item 33).

In Ms. M. *ex rel.* K.M. v. Portland Sch. Comm., 360 F.3d 267 (1st Cir. 2004), the First Circuit ruled that when the parents fail a required element of the tuition reimbursement remedy, they are not entitled to reimbursement under the label of compensatory education.  Id. at 273.  That principle applies to the first part of the compensatory education requirement, namely, tuition reimbursement: "[g]iven [the] restrictions on the equitable remedy of tuition reimbursement that are directly applicable here, allowing [the parent] to pursue a compensatory education claim for tuition reimbursement would undercut the statute."  Id.

In the second part of their compensatory education claim, the parents request "future services aimed at addressing the deficits resulting from past deprivations of LI's rights."  Pls.' Mem. at 48; see also Pls.' Reply Mem. at 15.[19]

---

[19] More specifically, the parents state that:

> [L.I.] continues to require the type of programming recommended long ago by [experts]—direct instruction in social skills and executive functioning, along with counseling to develop social judgment and coping skills—if she is ever going to be able to return to a public school setting or succeed in mainstream settings in her life after school. . . .
>
> . . . Thus, L.I.[ ] seeks a compensatory education order that will provide her with the type of direct instruction and coaching she requires (and already should have begun receiving) to remediate and enhance her social, executive, adaptive, and coping skills, with these services to be implemented at the District's expense in [the Community

*(continued next page)*

Now that I have found L.I. IDEA-eligible, it is appropriate for the PET to develop an IEP and make the preliminary determination of what she "needs" in 2006. An IEP will contain detailed statements of "the student's present level of educational performance," "measurable annual goals . . . relating to meeting the student's needs that result from the [] disability," "specific special education and supportive services and supplemental aids and services to be provided[,] . . . the amount of each service, and the staff . . . providing the services and . . . the program modifications or supports for school personnel that will be provided," and the dates and duration of services. MSER § 10.2(A)-(D); <u>see</u> <u>also</u> 34 CFR § 300.347 (same). The IEP necessarily will take into account the effect of the School District's failure to identify and offer L.I. special education services earlier. If she has more needs as a result of the delay, they should be apparent in the PET meeting. If the IEP is inadequate, the parents can seek relief at a due process hearing and in this court, but I am not in a position to determine *now* what special education L.I. needs at this point in her education.

**(F)  Summary**

I conclude that L.I. and her parents have demonstrated that she is a "child with a disability" that "adversely affects [her] educational performance," and thus eligible for special education under the IDEA, due to her Asperger's Syndrome and her depressive disorder. The PET shall reconvene and develop an appropriate IEP for her, but the parents are not entitled to the additional remedy of reimbursement

---

School] setting. . . . In addition, such compensatory services should be made part of any plan for her ultimate transition back to [public] school . . .

Pl.'s Mem. at 49-50.

for their unilateral placement of L.I. at the Community School, nor are they entitled at this point to a judicially ordered compensatory education remedy.

## V.  SECTION 504 CLAIM

In Count II of their Complaint, L.I.'s parents claim that the School District violated § 504 of the Rehabilitation Act. Compl. ¶¶ 66-70 (Docket Item 1). Section 504 of the Rehabilitation Act provides that no "individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" by a federally funded entity. 29 U.S.C. § 794(a). L.I.'s § 504 claim is presented on the same facts as her IDEA claim.

The School District denies any § 504 violation. Moreover, as an affirmative defense, the School District has asserted that the parents cannot pursue their § 504 claim because they failed to exhaust their administrative remedies. I conclude that the parents did exhaust their administrative remedies as required by the IDEA, but that the School District is entitled to judgment on the § 504 claim on the merits.

### (A)  Exhaustion of Administrative Remedies

The IDEA requires that any § 504 claimant "seeking relief that is also available under" the IDEA must exhaust administrative remedies "to the same extent as would be required had the action been brought under this subchapter [i.e., the IDEA]." 20 U.S.C. § 1415(l). There is no dispute that L.I.'s parents exhausted their administrative remedies under the IDEA. But the School District argues that they failed to alert the Hearing Officer to their § 504 claim. I conclude that exhausting the IDEA claims was sufficient; the parents were not required to argue the § 504 claim to the Hearing Officer. I draw this conclusion from the plain

language of the statute, the relevant caselaw and the underlying policy considerations.

As the First Circuit has stated, "IDEA's mandate is explicit: plaintiffs must exhaust IDEA's impartial due process hearing procedures in order to bring a civil action under . . . IDEA or any 'such law[] seeking relief that is also available' under [ ] IDEA." Weber v. Cranston Sch. Comm., 212 F.3d 41, 53 (1st Cir. 2000) (citation omitted); see also Fitzpatrick v. Town of Falmouth, 324 F. Supp.2d 95, 98 (D. Me. 2004). Section 504 is just such a law in the educational context. Therefore, to pursue § 504 claims, parents must first exhaust IDEA due process hearing procedures. Weber, 212 F.3d at 52 (Section 504 claim brought by parent claiming retaliation for enforcing her child's IDEA rights).

Accordingly, when a plaintiff brings a claim under § 504 that is "within the zone of interests" of IDEA, but has failed to request or attend an IDEA due process hearing, she is barred from § 504 relief by her failure to exhaust her administrative remedies. Id.; see also Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 64 (1st Cir. 2002) (same result for 42 U.S.C. § 1983 claims premised on violation of IDEA, when plaintiffs never requested IDEA due process hearing).

On the other hand, where a plaintiff *has* requested and attended an IDEA due process hearing regarding deprivation of her child's IDEA rights, a court may consider her related § 504 claim on the merits. See Rafferty, 315 F.3d at 28. It is true that Rafferty holds that a plaintiff must raise all alleged violations of the IDEA in the IDEA due process hearing. Id. at 26. But Rafferty does not hold that the plaintiff must raise all *other* alleged violations of the law at that IDEA hearing. Indeed, the Rafferty court proceeded to analyze the § 504 claim on the merits, id. at

27-28.  Neither the statute nor the caselaw creates a separate requirement that the plaintiff must argue the § 504 claim to the Hearing Officer.  The point of the exhaustion requirement is to ensure that the plaintiff seeks, and the school district provides, all the *IDEA relief* to which she is entitled.  That may well affect the contours of her remaining § 504 claim. But that is not the same as requiring her to argue § 504 to the Hearing Officer.

This conclusion makes sense.  Parents sometimes engage the due process hearing procedures to resolve their concerns without hiring legal counsel.  At that stage, the focus of all parties is supposed to be on the educational needs, not legal technicalities.  As *amici curiae* have pointed out, requiring "*pro se* parents to conceive of a section 504 claim and plead it at the initiation of the process" would create "an unreasonable and unnecessary burden."  Amici Curiae Br. of Disability Rights Ctr. & Autism Soc'y of Me. ("DRC & Autism Soc'y Brief") at 8 (Docket Item 46).  After all, the Hearing Officer will determine the full range of the IDEA rights. What is gained by telling the Hearing Officer that there may also be § 504 claims, claims that the Hearing Officer cannot resolve?[20]  The practical consequence would

---

[20] An IDEA due process hearing is appropriate to resolve a "disagreement regarding the identification, evaluation, placement or the provision of a free appropriate public education to the student."  MSER § 13.1.  Maine hearing officers have held that they lack jurisdiction to adjudicate claims not arising from the IDEA.  See Parents v. S. Portland Sch. Dep't, Case No. 04.132H (Me. Dep't of Educ. Nov. 22, 2004); Parent v. Lisbon Sch. Dep't (Union 30), Case. No. 00.184 (Me. Dep't of Educ. Sept. 20, 2000).  The Maine Department of Education letter cited by the defendant does not contradict this.  It states what is surely correct, that a hearing officer "may consider [a] 504 issue as it relates to an issue under IDEA," such as where a child previously identified under 504 should properly "have been identified under IDEA . . . rather than under Section 504."  Letter from Pauline Lamontagne, Due Process Coordinator, Me. Dep't of Educ., to Lou McIntosh, Merrywing Corp. at 1 (Nov. 15, 2002).  Determining whether a child should properly be identified under IDEA is precisely within the Hearing Officer's jurisdiction.  The letter does not thereby suggest that a Hearing Officer has authority to grant § 504 relief.  Indeed, the letter also states that § 504 claims are heard at the school district, state, and federal, but not administrative level.  Id.  Moreover, the Hearing Officer made clear her awareness of the § 504 claim in this case, referring to the § 504 plan in her decisions.

be a need for lawyers from the very beginning of the proceedings so as to avoid waiver, with a consequent added financial burden to the school districts and public fisc.  See Schaffer, ___ U.S. at ___, 126 S. Ct. at 535 (questioning "whether marginal dollars should be allocated to litigation and administrative expenditures or to educational services").

The rationale for the IDEA exhaustion requirement is that it places "those with specialized knowledge—education professionals—at the center of the decisionmaking process," ensures that educational agencies "have an opportunity to correct shortcomings," and allows "reliance of courts upon the detailed evidentiary record developed during the . . . hearing."  Frazier, 276 F.3d at 60-61.  If a § 504 claim is premised upon an IDEA violation, and the plaintiff argues those IDEA issues at a due process hearing, all those goals are met.  The school district has the opportunity to be at the center of the decisionmaking process, and to correct its mistakes through modification of the IEP, a reconsidered eligibility determination, etc.  The entire administrative record—highly relevant and probative evidence—will then be before the reviewing court for all the claims.

Therefore, I conclude that the parents adequately exhausted administrative remedies pursuant to 20 U.S.C. § 1415(l) by exhausting the due process hearing requirements under the IDEA, without alerting the Hearing Officer to their § 504 claim.

### (B) The Merits

Upon the School District's unopposed motion, the Magistrate Judge set limits for briefing and admission of evidence in the case.  As a result, all evidence and argumentation is before me now, including that pertaining to the § 504 claim.  See

Alternative Scheduling Order at 1 (Docket Item 11) ("There shall be no additional evidence in this case beyond the administrative record [and court-approved supplementation.] There shall be no discovery. . . . [T]he plaintiffs shall submit their brief . . . setting forth their legal position and argument, . . . [and] the defendant shall submit its brief . . . setting forth its legal position and argument.").

Although the merits of the § 504 claim are therefore ready for decision, neither side has paid much attention to the merits in their written and oral arguments. The sum and substance of the parents' argument[21] are:

> The district's 504 offer of March 8—the centerpiece of which was a half-day 1:1 tutorial program, with increasing integration to a public school setting that was certain to be rejected by LI or to result in a severe emotional reaction on her part—was incredibly restrictive. Not only was the program very limited in its number of service hours, but it failed to provide any meaningful contact between LI and non-disabled peers. In fact, it would have exacerbated LI's already overwhelming social isolation. This offer was particularly insufficient in light of LI's proven ability to interact with mainstream peers in the atmosphere of [the Community School]. In addition, the District's 504 offer failed to provide LI with the social skills coaching she required, while neglecting to offer an appropriate transition plan for her return to public school.

Pls.' Mem. at 41.[22]  The School District's argument is equally cursory:

---

[21] The only argumentation is in the original briefing. None appears in the objection and response to the Magistrate Judge's Recommended Decision, presumably because he rested his decision solely on the failure to exhaust administrative remedies.

[22] The plaintiffs made a similar argument in contending that the § 504 plan did not meet IDEA requirements:

> The hallmark of the 504 plan was a three hour block of 1:1 home tutoring each day with a goal of eventual placement at the Hiram Elementary School, even though LI's parents explained they would not be able to force LI to attend that school given her recent public school experiences. Moreover, LI's 504 plan did not address all of Dr. Popenoe's critical recommendations for LI, despite the District's argument to the contrary, because it failed to provide the essential social skills instruction that she requires. Moreover, the first phase of the proposed 504 plan required LI's complete withdrawal from her successful placement at [the Community School] in favor of segregated home tutorials for several hours per day, an incredibly restrictive approach to instructing a student whose chief special needs are *social*

*(continued next page)*

> If the Court were to reach this issue, the programming offered by
> the District would have provided LI with [a free appropriate
> public education] if the family had chosen to access it.  The array
> of services offered to her would surely have kept her safe during
> her programming; it provided her with the option of an
> immediate or gradual return to school; it offered her the option of
> attending a different public school if she did not want to return
> to this one, and it ordered a variety of supports for her upon her
> return that were very similar to what had been recommended by
> Psychologist Ellen Popenoe.

Def.'s Mem. at 50 (citations omitted).  The Hearing Officer did not decide the § 504

claim; it was not presented to her (and was not required to be).  However, she did

observe that the School District's § 504 offering:

> included   close   supervision,   two   hours   per   week   of
> speech/language therapy services per week, two half-hour
> sessions of social work services per week and access to the
> district "Gifted and Talented" offerings.   If necessary, Student
> could be tutored by an education technician for three hours a
> day at home while she made a gradual transition back to public
> school.

Hr'g Dec., Rec. at 556.  These, then, are the legal arguments and findings before me

on this claim.[23]

The substantive legal standard is similar in some ways to that of a claim

under IDEA, and different in others.  Unlike the IDEA's affirmative mandates, § 504

of the Rehabilitation Act, 29 U.S.C. §794, is prohibitory: (No "individual with a

disability . . . shall, solely by reason of her or his disability, be excluded from the

_____

> and who is capable of benefiting from mainstream teaching when it is
> provided in a safe environment.  Such a restrictive placement offer
> certainly violated the IDEA's requirement to provide services in the least
> restrictive environment, and thus cannot be deemed to have satisfied
> the District's IDEA obligations.

Pls.' Reply Mem. at 11-12 (emphasis original; citations omitted).

[23] As for the facts, the procedural posture is a claim submitted for judgment on a stipulated record,
which allows me to decide disputed issues of material fact.  See Boston Five Cents Sav. Bank v. Dep't
of Hous. and Urban Dev., 768 F.2d 5, 11-12 (1st Cir. 1985); Bhd. of Locomotive Engr's v. Springfield
Terminal Ry. Co., 210 F.3d 18, 31 (1st Cir. 2000).

participation in, be denied the benefits of, or be subjected to discrimination" by a federally funded entity, 29 U.S.C. §794.)   In the education context, it has been interpreted to guarantee the same "free appropriate public education" required by the IDEA.  Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 125 (1st Cir. 2003) (both "statutes may be available to redress particular denials of a free appropriate public education," and "apply similar standards for substantive relief"); Ms. S. ex rel. L.S. v. Scarborough Sch. Comm., 366 F. Supp.2d 98, 99 n.2 (D. Me. 2005).  Despite this similarity, however, the First Circuit has stated that "it may be that § 504 claims require some showing of deliberate indifference not required by IDEA."  Nieves-Marquez, 353 F.3d at 125 n.17 (citing Sellers by Sellers v. Sch. Bd., 141 F.3d 524, 529 (4th Cir. 1998) (holding that "either bad faith or gross misjudgment should be shown before a § 504 violation can be made out, at least in the context of education of handicapped children") (citation omitted)).  In this case, however, the only issue in dispute is the adequacy of the District's § 504 offerings to L.I.

The recently decided Supreme Court decision of Schaffer establishes a strong presumption that in the ordinary case the plaintiff bears the burden:

> Absent some reason to believe that Congress intended otherwise, therefore, we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief.

Schaffer, ___ U.S. at ___, 126 S. Ct. at 534-35 (also a special education case, albeit under the IDEA).   The parents are the party disputing the School District's educational placement decisions regarding their disabled child.   Therefore, I conclude that the burden of persuasion lies with the parents.  I find that they have failed to meet that burden.  With the cursory treatment provided in their legal memoranda, the parents have not persuaded me on this record that the School

District's proposed accommodations as enumerated by the Hearing Officer fell short of a free appropriate public education for L.I.

## VI.  CONCLUSION

I conclude that L.I. is eligible for special education services as a "child with a disability" within the meaning of the Individuals with Disabilities Education Act. Therefore, I **ORDER** the defendant MSAD No. 55 to convene a PET meeting and develop an appropriate IEP for L.I., taking into account her unique needs as they exist now and the recommendations of all experts, educational and psychological. But I **DENY** the request for tuition reimbursement and for compensatory education (without prejudice to whatever the IEP may require).  Judgment shall be entered for the plaintiff on Count I in accordance with this ruling.

I also conclude that  on Count II, the §504 claim,  administrative remedies were properly exhausted, but that the claim ultimately fails on the merits. Judgment shall therefore be entered for the defendant on Count II.

**SO ORDERED.**

**DATED THIS 30TH DAY OF JANUARY, 2006**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

48